# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 03-2470 & 03-2607

DR. LINDA A. RODRIGUE,

*Plaintiff-Appellee, Cross-Appellant,*

*v.*

OLIN EMPLOYEES CREDIT UNION,

*Defendant-Appellant, Cross-Appellee.*

_____

Appeals from the United States District Court
for the Southern District of Illinois.
No. 00 C 869—**David R. Herndon**, *Judge.*

_____

ARGUED SEPTEMBER 21, 2004—DECIDED APRIL 19, 2005

_____

Before MANION, ROVNER, and WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* Beginning in 1992, an employee
of Linda A. Rodrigue, M.D., stole some 269 reimbursement
checks issued to the doctor by her patients' insurers, frau-
dulently endorsed the checks over to herself, and presented
them to her credit union, Olin Employees Credit Union
("Olin"). Olin accepted the checks. Rodrigue finally discov-
ered the embezzlement in 1999 and filed a diversity suit
against Olin for conversion the following year. Following a
bench trial, the district court concluded that the conversion

of all 269 checks amounted to a single or continuous injury under Illinois law that did not terminate until the last of the checks was negotiated in 1999; consequently, the three-year statute of limitations on Rodrigue's cause of action for conversion did not begin to run until that time, and Rodrigue's suit against Olin was timely as to all of the stolen checks. The court further concluded that Olin had failed to observe ordinary commercial standards in accepting the fraudulently endorsed checks and that the credit union was therefore liable for the conversion of the checks. Upon considering the relative fault of Rodrigue and Olin for the conversion, the court assigned 10 percent of the responsibility to Rodrigue and 90 percent to Olin. After adjusting the total damages to reflect Rodrigue's share of responsibility for the loss, the court entered judgment in the amount of $334,864.96 in favor of Rodrigue. Olin has appealed, contending that a cause of action for conversion accrued, and the statute of limitations began to run, each time a stolen check was negotiated, so that Rodrigue was barred from suing on any check cashed or deposited more than three years before she filed suit in 2000. Olin also contends that the district court clearly erred in assigning it 90 percent of the responsibility for the loss. Rodrigue cross-appeals, challenging the district court's decision to apportion 10 percent of the blame for the loss to her. We agree with Olin that the conversion of the checks did not amount to a single or continuous injury under Illinois law and that the statute of limitations for conversion began to run with the negotiation of each check; Rodrigue's suit was therefore untimely as to any check negotiated more than three years before she filed suit. We conclude that the district court committed no clear error in its allocation of comparative fault as between Olin and Rodrigue, however.

## I.

Dr. Rodrigue is an obstetrician-gynecologist who has operated a private practice under the name of North County

Women's Health Care Services, P.C., in Florissant, Missouri since August 1989. The Christian Hospital System sponsored Dr. Rodrigue when she went into private practice, providing her with start-up and relocation assistance and a practice consultant who helped draft and publish an employee manual. In November 1990, after Rodrigue missed an event to which she had been invited due to an employee's mishandling of the office mail, she revised the employee manual to prohibit anyone in the office from opening the mail other than the doctor herself.

Rodrigue hired Carol Wiltshire on May 1990. Although initially hired to work as a medical receptionist and secretary, over the nine years Wiltshire worked for Dr. Rodrigue, she held a variety of positions of increasing responsibility and authority within the office. By 1993, Wiltshire was a billing specialist and later an office supervisor. At the time of Wiltshire's termination in December 1999, she was working as office manager.

In her position as billing specialist, Wiltshire was responsible for understanding insurance requirements and was the only person in the office trained in the Doctor's Office Management System ("DOMS") when Rodrigue converted to the computerized billing system in 1992. Even Rodrigue did not seek training in the DOMS software, which was used to manage accounts by tracking charges, payments, and adjustments. Adjustments entered in the DOMS system, interchangeably referred to as "write-offs" in the record, were supposed to reflect the portions of Rodrigue's charges that insurance providers disallowed and thus would not pay. From 1992 until her termination in 1999, Wiltshire was solely responsible for entering charges, adjustments, payments and closing out monthly statements for patient charges using the DOMS software. After learning how to use the software, Wiltshire began stealing checks from various insurance providers payable to Rodrigue from the doctor's mail.

The DOMS software was designed to help doctors detect employee theft by keeping track of all deleted charges and preventing all approved payments and adjustments from being removed or deleted. These features would prevent someone from posting a payment to an account, then deleting the payment from the system and keeping the money. Nonetheless, Wiltshire used her knowledge of the DOMS software to "zero out" patients' accounts to indicate that the accounts had been settled when, in fact, Wiltshire had stolen the insurance reimbursement checks sent to Rodrigue's office. To bypass the security features of the DOMS software, Wiltshire would enter a negative adjustment to the system equal to the charge, thus making the account balance zero. Because Rodrigue only reviewed DOMS-generated reports reflecting her accounts receivable, she did not notice the large number of adjustments that Wiltshire was entering into the system to cover her embezzlement.

During the course of her employment at Dr. Rodrigue's office, Wiltshire stole 269 checks, totaling $372,572.18, written by insurance providers to Dr. Rodrigue. After manipulating the DOMS billing system to make it appear as though no funds were stolen, Wiltshire would forge Dr. Rodrigue's endorsement on the insurance checks, direct that they be paid to herself, and deposit or cash them at Olin's Godfrey, Illinois branch, where Rodrigue and her husband maintained a joint account.

Olin's tellers testified at trial that presentment of checks made payable to a third party was not unusual; however, as a matter of unwritten policy, Olin required tellers to obtain a supervisor's approval before accepting third-party checks. When Wiltshire first attempted to deposit a third-party check at Olin in 1992, the teller sought approval from Sarah Woodman, a supervisor who had been working for Olin since 1987. Woodman asked Wiltshire about the check, and Wiltshire told her that she worked as a midwife for Rodrigue and that the doctor compensated her for her

services by signing over to her insurance reimbursement checks. Woodman refused to take the check without some form of authorization from Rodrigue. Wiltshire later provided Woodman with a forged letter of authorization purporting to be from Rodrigue, and Woodman accepted the third-party check. Although this was the first time that Woodman had seen payments for services made through a third-party check, she did not think it was suspicious but "curious." Woodman sent the original forged authorization letter to Olin's main office but did not keep a copy of the letter on file at the local branch. At the time of trial, Olin could not locate the letter.

In early 1993, Wiltshire presented one of the checks to Olin teller Karrie Stahl, who again sought approval from Woodman. Woodman told Stahl that there was an authorization note from Rodrigue on file and instructed Stahl to accept the check but to ask for a notarized letter of authorization from Rodrigue for future checks. Stahl testified that Wiltshire later produced a notarized letter on Rodrigue's letterhead and that she compared the signature on the letterhead with that on the third-party check. Yet again, the letter was a forgery; Rodrigue never authorized Wiltshire to cash or deposit checks made payable to her. Although Stahl found it "odd" that Wiltshire was paid in this manner, the notarized letter and the details Wiltshire provided about the births in which she (purportedly) had assisted supported her story. The original notarized letter was sent to Olin's main office, and a copy was kept in a folder by Woodman's desk; however, Olin was unable to produce either the notarized letter or the copy at the time of trial.

At some point, Woodman tried to telephone Rodrigue in order to verify that Wiltshire had the doctor's permission to cash or deposit the third-party checks. Woodman was unable to reach Rodrigue and did not attempt to call her again, satisfied that Olin had received "the correct written documentation."

Rodrigue's practice began suffering from financial difficulties around 1994 or 1995, and Rodrigue had to borrow money and moonlight at the hospital in order to make ends meet. In 1992 and 1993, insurance companies had reimbursed Rodrigue for approximately 80 to 90 percent of what she billed, but in the following years reimbursement rates dropped steadily—or so it appeared. Between 1991 and 1999, Rodrigue used three different accounting firms, which prepared monthly and later quarterly summaries of Rodrigue's business activities based on bank statements, payroll deposits, and other information that Rodrigue provided. When Rodrigue began to believe that no matter how hard she worked she could not pay her bills, she consulted her accountants to see how she could make her practice profitable. Rodrigue's accountants focused on her accounts receivable and suggested that she find insurance providers who had higher reimbursement rates and streamline her office operations to cut costs. Rodrigue's accountants did not suggest an audit of her practice, nor did Rodrigue request an audit. Rodrigue testified that, according to her accountants, many other medical practices were suffering from losses as a result of poor insurance providers and that the drop in income that her practice was suffering was not atypical.

Rodrigue finally discovered Wiltshire's embezzlement at the end of November 1999, after her sister-in-law, Denise Rodrigue ("Denise"), told her that she believed Wiltshire had been taking mail into her office, opening it, and stealing insurance checks. Rodrigue had hired Denise to work as a receptionist in the office in 1997. Around Thanksgiving 1999, Denise noticed Wiltshire take the mail into her office and close the door; Denise then heard envelopes being opened. Shortly thereafter, Denise entered Wiltshire's office and saw insurance checks in Wiltshire's open purse. A few days later, Denise looked through the mail before Wiltshire took it into her office and wrote down the number of enve-

lopes that appeared to contain insurance reimbursement checks, along with the names of the insurers. Denise then told Rodrigue that she believed Wiltshire was stealing checks, and gave her the list of checks that were in the mail that day. When Rodrigue looked through the mail, she found that many of the checks were missing. Rodrigue subsequently telephoned her insurance providers and was sent copies of the reimbursement checks they had previously sent to her, more than half of which had been fraudulently endorsed by Wiltshire. After receiving over twenty fraudulently endorsed checks, Rodrigue gave a statement to the Florissant Police Department and then filed an Affidavit of Forgery with Olin; she also terminated Wiltshire. The Florissant Police arrested Wiltshire, who was charged and convicted of bank fraud and sentenced to eighteen months' imprisonment. Wiltshire was also ordered to pay Rodrigue almost $161,000 in restitution. Rodrigue testified at trial that the restitution order included only those checks that were known to have been stolen at the time of Wiltshire's sentencing (a total of 115 checks), and that she had thus far only received about $450 in restitution from Wiltshire.

Rodrigue filed a complaint for conversion against Olin on November 1, 2000. After a three-day bench trial, the court found for Rodrigue and against Olin on her claim for the conversion of negotiable instruments.

The court found Olin liable pursuant to section 3-420(a) of the Illinois Uniform Commercial Code ("UCC" or the "Code"), which in relevant part provides that "[t]he law applicable to conversion of personal property applies to instruments" and that "[a]n instrument is . . . converted if it is taken by transfer, other than negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment." 815 ILCS 5/3-420(a). To establish that a financial institution is liable for conversion under Illinois

law, the plaintiff must establish (1) that she owned, held an interest in, or had the right to possess a negotiable instrument; (2) that someone forged or without authority placed the plaintiff's endorsement on the instrument; and (3) that the defendant financial institution negotiated the check without her authorization. R. 114 at 8 ¶ 13, citing *Continental Cas. Co. v. American Nat'l Bank & Trust Co. of Chicago*, 768 N.E.2d 352, 361 (Ill. App. Ct. 2002), and *Burks Drywall, Inc. v. Washington Bank & Trust Co.*, 442 N.E.2d 648, 652 (Ill. App. Ct. 1982). The Court found that Rodrigue had proven each of these elements: she had the requisite interest in the reimbursement checks that her patients' insurers had mailed to her, Wiltshire had forged her endorsement on the checks, and Olin had permitted Wiltshire to cash or deposit the checks without Rodrigue's authorization. R. 114 at 8-13 ¶¶ 14-22. The court went on to reject each of the three defenses that Olin asserted to liability for conversion of the checks.

First, the court rejected Olin's contention that the three-year limitations period specified by the Illinois UCC, 810 ILCS 5/3-118(g), barred Rodrigue's cause of action for conversion as to many of the stolen checks because those checks were negotiated more than three years before she filed suit in 2000. Rather than view the negotiation of each check as a discrete wrong, the court deemed the entire series of 269 checks, negotiated over an 85-month period, to be a continuing violation that did not terminate, and did not trigger the statute of limitations, until the last check was negotiated in 1999. R. 114 at 13-15 ¶¶ 24-26, citing, *inter alia*, *Field v. First Nat'l Bank of Harrisburg*, 619 N.E.2d 1296, 1298-99 (Ill. App. Ct. 1993), and *Haddad's of Illinois, Inc. v. Credit Union 1 Credit Union*, 678 N.E.2d 322, 324 (Ill. App. Ct. 1997).

Second, the court found that the "faithless employee" provision of the Code, 810 ILCS 5/3-405(b), did not shield Olin from liability. That provision of the Code specifies that when

an employee whom the employer has given responsibility to handle a negotiable instrument forges her employer's endorsement on an instrument payable to the employer, and a person (here Olin) in good faith pays the instrument or takes it for value or collection, the forged endorsement is considered effective as the employer's endorsement. *Id.* The court agreed that Rodrigue had entrusted Wiltshire with responsibility for posting the insurance payments in the DOMS software and so Wiltshire qualified as a responsible employee for the purposes of this provision. R. 114 at 16-17 ¶¶ 28-29; *see* § 5/3-405(a)(3), UCC Comment 3, Case 3. But the faithless employee defense is not absolute; rather, if the person paying or accepting the fraudulently endorsed instrument failed to exercise ordinary care in doing so and that failure substantially contributed to the resulting loss, then that person may be liable to the extent his or her negligence contributed to the loss. § 5/3-405(b) & UCC Comments 1 & 2. In the district court's view, Olin had not exercised ordinary care in accepting the checks that Wiltshire had fraudulently endorsed, and its omission had substantially contributed to Rodrigue's loss: although Olin's personnel had found it "odd," "curious," and "strange" that Wiltshire would be paid for her services by way of third-party checks from insurers, it had nonetheless accepted the checks without seeking direct confirmation from Rodrigue that she had actually endorsed the checks over to Wiltshire. R. 114 at 17-20 ¶¶ 30-36.

Third, the court rejected the notion that Rodrigue's own failure to exercise ordinary care had substantially contributed to the fraudulent endorsement of the checks and that, consequently, she could not recover from Olin pursuant to 810 ILCS 5/3-406(a). The court found that Rodrigue had exercised ordinary care in hiring Wiltshire notwithstanding the doctor's failure to discover that Wiltshire had previously been convicted of embezzlement: Wiltshire came to her with apparently excellent credentials, Rodrigue had checked

Wiltshire's references in the relevant field, and Wiltshire was given high recommendations. R. 114 at 21 ¶ 38. The court also found no fault with the way in which Rodrigue ran her office: the doctor had established office procedure which directed that only she was to open the mail, and she had relied on accountants to provide her with advice as to her finances. R. 114 at 21-22 ¶¶ 39-40.

Olin was therefore liable for the conversion of the checks to the extent its failure to exercise ordinary care had contributed to Rodrigue's loss. Assessing Olin's fault as compared to Rodrigue's, the court determined that Olin's negligence was responsible for 90 percent of the loss, while Rodrigue's negligence was responsible for the remaining 10 percent. R. 114 at 20 ¶ 36.

Based on the collective face value of the 269 checks that Wiltshire had stolen and Olin had accepted, the court found that Rodrigue's total damages were $372,572.18. The court reduced that amount by 10 per cent to reflect Rodrigue's comparative negligence and deducted the $450 Wiltshire thus far had paid to Rodrigue in restitution. Accordingly, the court entered judgment in favor of Rodrigue and against Olin in the amount of $334,864.96.

## II.

### A.  Statute of Limitations

Treating the conversion of all 269 checks that Wiltshire embezzled from Rodrigue as a single, continuing wrong, the district court held that Rodrigue's suit was timely as to all of the checks, notwithstanding the fact that many of them were negotiated more than three years before Rodrigue filed suit in November 2000. As the pertinent facts are undisputed, this was a legal determination that we review de novo. *E.g.*, *United States v. Greene-Thapedi*, 398 F.3d 635, 637 (7th Cir. 2005).

Under the Illinois UCC, a cause of action for the conversion of a negotiable instrument is subject to the limitations period set forth in section 3-118(g): "[A]n action (i) for conversion of an instrument, for money had and received, or like action based on conversion . . . must be commenced within 3 years after the cause of action accrues." 810 ILCS 5/3-118(g). Courts in Illinois have held that a limitations period generally begins to run "when facts exist which authorize one party to maintain an action against another." *Sundance Homes, Inc. v. County of Du Page*, 746 N.E.2d 254, 266 (Ill. 2001) (*quoting Davis v. Munie*, 85 N.E. 943, 944 (Ill. 1908)). With respect to the conversion of a negotiable instrument, section 3-420(a) of the Code provides that "[a]n instrument is . . . converted if . . . a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment." 810 ILCS 5/3-420(a). Thus, Illinois courts have held that a cause of action for conversion of negotiable instruments accrues at the time the check is negotiated. *See, e.g.*, *Nelson v. Sotheby's Inc.*, 115 F. Supp. 2d 925, 929 (N.D. Ill. 2000) (applying Illinois law); *Haddad's of Illinois, Inc. v. Credit Union 1 Credit Union, supra*, 678 N.E.2d at 326. Thus, applying the statute of limitations in a straightforward, mechanical manner, the limitations period with respect to each of the checks that Wiltshire stole began to run at the time Wiltshire negotiated the check.

In deciding not to apply the statute of limitations in this manner, the district court looked to two opinions from the Illinois Appellate Court applying what we will call the "continuing violation" rule. Consistent with the rationale of those cases, the court reasoned that where a series of fraudulently endorsed checks is cashed "as part of an 'ongoing scheme, plan, conspiracy, or the like,'" the negotiation of each check is considered part of a single, continuing wrong and the statute of limitations does not begin to run until the last check is negotiated. R. 114 at 14 ¶ 24, citing

*Field v. First Nat'l Bank of Harrisburg, supra*, 619 N.E.2d at 1298-99, and *Haddad's of Illinois*, 678 N.E.2d at 324. Thus, although Olin accepted the first of the embezzled checks from Wiltshire in 1992, more than eight years before Rodrigue filed suit, the statute of limitations did not begin to run as to any of the checks until 1999, when the embezzlement was finally discovered. R. 114 at 14-15 ¶¶ 25-26. Olin contends that the district court erred when it invoked the continuing violation rule.

The Illinois Supreme Court has not yet considered whether the continuing violation rule should apply to a cause of action for the serial conversion of multiple negotiable instruments.[1] Therefore, our task is to apply the law as we predict the Illinois Supreme Court would if it were deciding this case. *E.g.*, *Mutual Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 612 (7th Cir. 2001).

In concluding that the conversion of all 269 checks should be treated as a single, continuing wrong, the district court relied principally on the Illinois Appellate Court's opinion in *Field v. First Nat'l Bank of Harrisburg*, 619 N.E.2d 1296. In *Field*, the administrator of Raymond E. Field's estate brought an action for conversion against Field's daughter and the First National Bank of Harrisburg after discovering that over the course of four years, Field's daughter had deposited pension checks endorsed by Field and bearing the restriction "for deposit only" into her own bank account at the defendant bank. The *Field* court held that the defendants' course of conduct constituted "one continuous

---

[1] In *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 86 (Ill. 2003), the Illinois Supreme Court did cite the appellate court's opinion in *Field* as an example of a case in which the continuing violation rule had been applied. However, as we discuss below, we do not construe the Court's citation of *Field* as an actual holding that the rule should apply to a cause of action for the conversion of negotiable instruments.

transaction or scheme for the purposes of the commence-ment of the statute of limitations." *Id.* at 1298. The court was admittedly "unable to find any cases in which a series of checks cashed is said to constitute a single transaction for purposes of the running of the statute of limitations." *Id.* at 1299. However, the court found the law to be "clear that where a tort involves a continued repeated injury, the limitation period does not begin until the date of the last injury or when the tortious act ceased." *Id.* (collecting cases). The court also found the conversion of a series of checks to be somewhat analogous to a fraudulent scheme based on a series of misrepresentations, or an antitrust conspiracy involving a series of overt acts; in both scenarios, courts had concluded that the statute of limitations did not begin to run until the last misrepresentation or overt act occurred. *Id.* Drawing guidance from these precedents, the court reasoned that the plaintiff had alleged facts sufficient to permit the inference that there was an ongoing " 'scheme, plan conspiracy or the like' which would transform the de-posits [of the converted checks] into what could be consid-ered a single transaction." *Id.* The statute of limitations thus did not begin to run until the last of the checks was deposited. *Id.*; *see also Haddad's of Illinois*, 678 N.E.2d at 324 (following *Field*).

*Field* plainly supports the district court's conclusion as to the statute of limitations; but looking to the Illinois Su-preme Court's own cases concerning the continuing vio-lation rule, we are convinced that the Court would not apply that rule to a cause of action for the conversion of negotiable instruments. The Illinois Supreme Court has not adopted "a continuing violation rule of general applicability in all tort cases, or . . . cases involving a statutory cause of action." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 191 (Ill. 2002). Instead, the Court has carefully assessed the nature of a particular cause of action in order to determine whether the continuing violation rule should apply.

Where a cause of action arises not from individually identifiable wrongs but rather from a series of acts considered collectively, the Illinois Supreme Court has deemed application of the continuing violation rule appropriate. For example, in *Cunningham v. Huffman*, 609 N.E.2d 321 (Ill. 1993), the Court held that the continuing violation rule tolled a statute of repose governing medical malpractice claims, where the plaintiff's claim of malpractice arose from a continuous, related, unbroken course of negligent treatment. "When the *cumulative* result[ ] of continued negligence is the cause of injury," the Court observed, "the statute of repose cannot start to run until the last date of negligent treatment." *Id.* at 325 (emphasis ours). Otherwise, the Court added, patients who suffered severe harm as the result of improper medical treatment administered over a period of years might find themselves with little or no remedy by the time they learned of their injury. *Id.* "Surely, the law could not contemplate such an unjust result." *Id.* Likewise, in *Feltmeier v. Feltmeier*, 798 N.E.2d 75 (Ill. 2003), the Court concluded that the continuing violation rule applied to an abused wife's cause of action for intentional infliction of emotional distress by her husband, where the cause of action was based on a pattern of abuse that took place over the course of more than 11 years. "While it is true that the conduct set forth in [the] complaint could be considered separate acts constituting separate offenses of, *inter alia*, assault, defamation and battery, [plaintiff] has alleged, and we have found, that [defendant's] conduct *as a whole* states a cause of action for intentional infliction of emotional distress." *Id.* at 86-87 (emphasis in original).

By contrast, as the Court's opinion in *Belleville Toyota* reveals, the continuing violation rule does not apply to a series of discrete acts, each of which is independently actionable, even if those acts form an overall pattern of wrongdoing. In *Belleville Toyota*, an automobile dealership sued its wholesale distributor and importer, alleging breach of dealer

agreements and numerous violations of the Motor Vehicle Franchise Act ("MVFA") in the defendants' allocation of automobiles to plaintiff over the course of almost 10 years. A four-year statute of limitations applied to claims under the MVFA, but the lower courts, reasoning that the alleged MVFA violations constituted a single, ongoing wrong, had invoked the continuing violation rule to toll the statute of limitations. The Illinois Supreme Court reversed, concluding that the continuing violation rule was inapplicable. The Court could not accept the notion that the defendants' automobile allocations, each of which was "the result of discrete decisions by defendants regarding the numerous adjustable parameters that drove the computerized allocation system . . . constituted one, continuing, unbroken, decade-long violation of the [MVFA]." *Id.* at 192. "Rather, each allocation constituted a separate violation of section 4 of the [MVFA], each violation supporting a separate cause of action." *Id.* Thus, the nature of the alleged wrong did not justify the application of the continuing violation rule. *Id.* The Court added that, in contrast to *Cunningham*, there were no apparent "unjust results" that would militate against application of the usual rule that the limitations period begins to run with the accrual of a cause of action. *Id.* at 191.

*Belleville Toyota* leads us to believe that the continuing violation rule should not apply here, either. Unlike a cause of action for medical malpractice based on a course of negligent treatment with cumulative effects, or a cause of action for the intentional infliction of emotional distress arising from a course of tortious acts considered as a whole, Rodrigue's claim for conversion does not depend on the cumulative nature of either Wiltshire's or Olin's acts. Rather, a cause of action for conversion arose each time Wiltshire cashed or deposited one of the checks she had embezzled. The fact that Wiltshire managed to negotiate hundreds of checks over an 85-month period is irrelevant insofar as Rodrigue's right or ability to sue for conversion. Whether

Wiltshire had negotiated one check or 1000, Rodrigue had a valid cause of action for conversion; nothing about the repeated or ongoing nature of Wiltshire's conduct affected the nature or validity of Rodrigue's suit, beyond increasing her damages. Moreover, in contrast to a claim that arises from a cumulation of wrongful acts, a claim for conversion does not pose undue difficulty for the victim in identifying the nature, origin, and extent of her injury. *Cf. Feltmeier*, 798 N.E.2d at 87 (quoting *Pavlik v. Kornhaber*, 761 N.E.2d 175, 187-88 (Ill. App. Ct. 2001)); *Cunningham*, 609 N.E.2d at 325. There is, for example, no question as to whether, when, and to what degree Rodrigue was harmed—the dates on which Olin improperly accepted the checks, and the amounts of those checks, make such determinations straight-forward. Thus, as in *Belleville Toyota*, there are no poten-tially unjust results militating against application of the ordinary rule that the statute of limitations begins to run when the cause of action accrues. Only Rodrigue's failure to discover Wiltshire's wrongdoing sooner than she did makes application of the ordinary rule seem harsh. But, in contrast to cases involving claims that are dependent on the cumula-tive nature of a defendant's wrongful acts, making it difficult to determine when those claims accrue, Rodrigue's belated discovery of her injury has little or nothing to do with the nature of the claim for conversion.

We recognize that the Supreme Court in *Feltmeier* cited *Field* as an example of a case that treated a series of re-peated or ongoing acts as "a continuing whole for prescrip-tive purposes." 798 N.E.2d at 86, citing, *inter alia*, *Field*, 619 N.E.2d at 1299. But the Court did so for illustrative purposes only. Nothing in *Feltmeier* signals that the Court undertook to examine the validity of *Field*'s rationale for invoking the continuing violation rule or to reconcile *Field* with the Supreme Court's own precedents—including *Belleville Toyota*—as to when invocation of the rule is proper. Therefore, we do not construe the mere citation of *Field* as an unqualified endorsement of *Field*'s holding or a

persuasive indication of how the Illinois Supreme Court would decide the question with which we are faced today. In our view, the Court's decision in *Belleville Toyota*, which dealt with facts comparable to the ones in this case, is a much better indicator of how the Court would decide this case; and *Belleville Toyota* suggests that it would be improper to apply the continuing violation rule here.

Notably, Rodrigue does not argue, in the alternative, that the discovery rule should apply to toll the statue of limitations in this case. As Rodrigue herself acknowledges, Illinois courts have refused to apply the discovery rule to claims for the conversion of negotiable instruments. Rodrigue Br. at 43; *see, e.g., Haddad's of Illinois*, 678 N.E.2d at 324-26. Like the continuing violation rule, the discovery rule is an equitable exception to the ordinary rule that the statute of limitations begins to run with the accrual of the cause of action. These exceptions operate in different ways: the discovery rule tolls the statute of limitations until such time as the plaintiff knew or reasonably should have known that she has a cause of action for her injury, while the continuing violation rule effectively postpones the running of the statute of limitations until the tortious conduct has ceased.[2] However, the two rules are "allied" in their underlying rationales. *Beard v. Edmondson & Gallagher*, 790 A.2d 541, 548 (D.C. 2002). The discovery rule typically applies in cases where " 'the relationship between the fact of injury and the alleged tortious conduct [is] obscure.' " *Id.* at 546 (quoting *Colbert v. Georgetown Univ.*, 641 A.2d 469, 472 (D.C. 1994)). Thus, the statute of limitations is tolled until

---

[2] Because the continuing violation rule can serve to toll the statute of limitations even beyond the point at which the plaintiff knows or reasonably should know that she has suffered an actionable harm, there is, as the Illinois Supreme Court has pointed out, some tension between that rule and the discovery rule. *Belleville Toyota*, 770 N.E.2d at 192. The Court has not undertaken to resolve that tension, however. *Id.*

such time as the plaintiff knew, or in the exercise of rea-sonable diligence should have known, that she was injured, the cause of her injury, and that there was some indication of wrongdoing. *Id.*; *see also Belleville Toyota*, 770 N.E.2d at 192; *Golla v. General Motors Corp.*, 657 N.E.2d 894, 898 (Ill. 1995). Similarly, the continuing violation rule is premised, at least in part, on the idea that where a cause of action arises from the cumulative nature or impact of a series of acts that occur over time, it can be difficult for the plaintiff to discern at any particular point during that time the wrongful and injurious nature of the defendant's conduct. *See Beard*, 790 A.2d at 547-48; *Feltmeier*, 798 N.E.2d at 87 (quoting *Pavlik v. Kornhaber, supra*, 761 N.E.2d at 187-88); *see also Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 134-35 (E.D.N.Y. 2000). Accordingly, the cause of action is deemed not to accrue, and the statute of limitations not to run, until the injurious conduct ceases or the last injury occurred. *E.g.*, *Feltmeier*, 798 N.E.2d at 89. Given the similarities between the two rules, it is instructive to consider whether courts have been willing to apply the discovery rule to a cause of action for the conversion of negotiable instruments and if not, why not.

Although a small number of jurisdictions have applied the discovery doctrine to toll the statute of limitations in actions for conversion of negotiable instruments,[3] the

---

[3] *See, e.g., DeHart v. First Fidelity Bank, N.A./South Jersey*, 67 B.R. 740, 745 (D.N.J. 1986); *Gallagher v. Santa Fe Federal Employees Federal Credit Union*, 52 P.3d 412, 416-17 (N.M. Ct. App. 2002); *UNR-Rohn, Inc. v. Summit Bank of Clinton County*, 687 N.E.2d 235, 240-41 (Ind. Ct. App. 1997); *Stjernholm v. Life Ins. Co. of N.A.*, 782 P.2d 810, 811-12 (Colo. Ct. App. 1989); *Branford State Bank v. Hackney Tractor Co.*, 455 So.2d 541, 542 (Fla. Dist. Ct. App. 1984) (per curiam).

Courts have articulated a variety of reasons for applying the discovery rule to claims involving the conversion of negotiable

(continued...)

Illinois Appellate Court, along with a decided majority of other jurisdictions, have refused to apply the discovery doctrine in that setting, except where the defendant invoking the statute of limitations engaged in fraudulent concealment.[4]

---

[3] (...continued)
instruments. In *Gallagher*, the New Mexico appellate court found application of the rule to be dictated by statute, 52 P.3d at 416-17, while in *UNR-Rohn*, the Indiana appellate court found it dictated by Indiana Supreme Court precedent extending the rule to all tort actions, 687 N.E.2d at 240-41. Otherwise, as the Illinois Appellate Court noted in *Haddad's of Illinois*, courts have typically articulated two grounds for applying the rule: that state policy favors the right of the individual to obtain recovery for his injury over the free flow of commerce, or that the rule is necessary in order to temper the sometimes harsh results that would otherwise flow from the mechanical application of the statute of limitations. 678 N.E.2d at 325; *see also Stjernholm*, 782 P.2d at 811-12.

[4] *See Haddad's of Illinois*, 678 N.E.2d at 325-26; *Ohio Cas. Ins. Co. v. Bank One*, No. 95 C 6613, 1996 WL 507292, at *7 (N.D. Ill. Sept. 5, 1996) (applying Illinois law); *see also, e.g., John Hancock Fin. Servs., Inc. v. Old Kent Bank*, 346 F.3d 727, 733-34 (6th Cir. 2003); *Menichini v. Grant*, 995 F.2d 1224, 1229-32 (3d. Cir. 1993); *Kuwait Airways Corp. v. American Sec. Bank, N.A.*, 890 F.2d 456, 460-63, 466 (D.C. Cir. 1989); *First Investors Corp. v. Citizens Bank, Inc.*, 757 F. Supp. 687, 690-92 (W.D.N.C. 1991), *aff'd mem.*, 956 F.2d 263 (4th Cir. 1992); *New Jersey Lawyers' Fund for Client Protection v. Pace*, 863 A.2d 402, 406-08 (N.J. Super. Ct. App. Div. 2005); *Hollywood v. First Nat'l Bank of Palmerton*, 859 A.2d 472, 478-82 (Pa. Super. Ct. 2004); *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620-24 (Tenn. 2002); *Palmer Mfg. & Supply, Inc. v. BancOhio Nat'l Bank*, 637 N.E.2d 386, 389-91 (Ohio App. Ct. 1994); *Lyco Acquisition 1984 Ltd. Partnership v. First Nat'l Bank of Amarillo*, 860 S.W.2d 117, 119 (Tex. App. 1993); *Husker News Co. v. Mahaska State Bank*, 460 N.W.2d 476, 477-79 (Iowa 1990); *Wang v. Farmers State Bank of Winner*, 447 N.W.2d

(continued...)

The rationale most often cited in support of the majority perspective is that application of the discovery rule would be inimical to the underlying purposes of the UCC, including the goals of certainty of liability, finality, predictability, uniformity, and efficiency in commercial transactions. In keeping with those goals, negotiable instruments are intended to function efficiently, and liability on those instruments is not meant to be open-ended. *Haddad's of Illinois*, 678 N.E.2d at 326. As the Illinois Appellate Court wrote in *Haddad's of Illinois*, "[t]he use of negotiable instruments was intended to facilitate the rapid flow of commerce." *Id.* Application of the discovery doctrine to a claim involving a negotiable instrument, by tolling the statute of limitations and giving the plaintiff a longer period of time in which to sue than the legislature provided, undermines the finality of transactions involving negotiable instruments and renders the negotiable instrument a less efficient vehicle of commerce.

> [T]he utility of negotiable instruments lies in their ability to be readily accepted by creditors as payment for indebtedness. Checks must be transferable. Consequently, 'in structuring the law of checks we . . . seek to enhance the negotiability of commercial paper so that it may play its role as a money substitute.' Robert Hillman, *et al.*, *Common Law and Equity Under the Uniform Commercial Code*, ¶ 14.01[1] (1985). Negotiability requires predictable and rapid collection through payment channels.

> Closely related to negotiability are commercial finality and certainty. "The finality of transactions promoted by

---

[4]  (...continued)
516, 518 (S.D. 1989); *Fuscellaro v. Industrial Nat'l Corp.*, 368 A.2d 1227, 1231 (R.I. 1977); *Gerber v. Manufacturers Hanover Trust Co.*, 315 N.Y.S.2d 601, 603 (N.Y. City Civ. Ct. 1970).

> an ascertainable definite period of liability is essential to the free negotiability of instruments on which commercial welfare so heavily depends." *Fuscellaro v. Industrial Nat'l Corp.*, 117 R.I. 558, 563, 368 A.2d 1227, 1231 (1977); [citation].

> * * *

> The Code drafters sought quick and inexpensive resolution of commercial disputes. This overarching goal is particularly important with negotiable instruments where the exigencies of commerce require inexpensive, quick, and reliable transfer of funds. . . .

*Haddad's of Illinois*, 678 N.E.2d at 326 (quoting *Menichini v. Grant*, 995 F.2d 1224, 1230-31 (3d. Cir. 1993) (footnotes omitted)); *see Continental Cas. Co. v. American Nat'l Bank & Trust Co. v. Chicago*, *supra*, 768 N.E.2d at 363; *see also*, *e.g.*, *Menichini*, 995 F.2d at 1231 ("[v]igorous application of the statue of limitations is a reasonable means of achieving certainty in commercial transactions"); *Ohio Cas. Ins. Co. v. Bank One*, No. 95 C 6613, 1996 WL 507292, at *7 (N.D. Ill. Sept. 5, 1996) (agreeing that "'a definite period of liability is essential' to negotiability") (quoting *Menichini*, 995 F.2d at 1231); *Husker News Co. v. Mahaska State Bank*, 460 N.W.2d 476, 478 (Iowa 1990) (observing that "considerations of finality and predictability . . . are substantial and outweigh the countervailing equities," and "[t]he strength of our system of commerce depends on a negotiable instrument law that is mechanical in application"); *Hollywood v. First Nat'l Bank of Palmerton*, 859 A.2d 472, 482 (Pa. Super. 2004) ("Our sister states have recognized that the need for expedition in commercial transactions is best achieved by safeguarding negotiability and finality of negotiable instruments and assuring uniformity of applicable law across state boundary lines. We too recognize the primacy of these considerations.").

Courts adhering to the majority rule have also pointed out that the UCC objective of promoting careful bookkeeping would be undercut by applying the discovery doctrine in check conversion cases. These courts reason that "the victim of the conversion is in the best position to easily and quickly detect the loss and take appropriate action"; thus the statute of limitations should further promote the incentive to carefully examine one's books. *Haddad's of Illinois*, 678 N.E.2d at 326 (citing *Husker News*, 460 N.W.2d at 479); *see also Euro Motors, Inc. v. S.W. Fin. Bank & Trust Co.*, 696 N.E.2d 711, 715 (Ill. App. Ct. 1998).

The mechanical application of the statute of limitations embraced by the majority view means that in cases where the malefactor's fraud goes undetected for the duration of the limitations period (not due to any fraudulent conceal-ment by the defendant), the victim may be left uncompen-sated. And in cases where the facts make that result seem harsh, courts may be inclined to invoke an equitable doc-trine like the discovery rule in order to permit recovery. Yet, as other courts have aptly noted:

> As tempting a choice as that may be in an individual case [i.e. favoring "the rights of unsuspecting victims of forgery over the broader interest of the commercial world"], we think the public would be poorly served by a rule that effectively shifts the responsibility for care-ful bookkeeping away from those in the best position to monitor accounts and employees. Strict application of the limitation period, while predictably harsh in some cases, best serves the twin goals of swift resolution of controversies and "certainty of liability" advanced by the U.C.C.

*Menichini*, 995 F.2d at 1230 (quoting *Husker News Co.*, 460 N.W.2d at 479).

For the same reasons that the Illinois Appellate Court and most other jurisdictions have rejected application of the

discovery rule to claims of check conversion, we believe that the Illinois Supreme Court would reject application of the continuing violation rule. Each instance of conversion is a discrete and actionable wrong, as Rodrigue's counsel (properly) conceded at oral argument. Invoking the continuing violation rule as to a series of converted checks thus would lack the typical justification that the wrong at issue is cumulative in nature and would serve only to delay the running of the statute of limitations so that the plaintiff may recover for acts of conversion that indubitably took place outside the limitations period. In a sense, the delay would seem justified here because Wiltshire was adept at her embezzlement and succeeded in hiding it from Rodrigue for more than seven years. But lengthening (here, more than doubling) the amount of time during which the parties to transactions involving negotiable instruments— including Olin, which played no role in the concealment of the fraud—may be haled into court would be inimical to the goals of efficiency, certainty, finality, and uniformity underlying the UCC. And it would weaken the incentive for the employer, who is in the best position to detect the fraud, to be vigilant in detecting conversion and safeguarding against it. *See* 810 ILCS 5/3-405, UCC Comment 1.

In sum, we conclude that application of the continuing violation rule was erroneous, and that the statute of limitations barred Rodrigue from recovering on any of the converted checks negotiated more than three years before she filed suit in 2000. Olin's brief represents that of the total worth of the 269 checks that Wiltshire stole from 1992 to 1999, "[a]bout" $235,900 corresponded to checks cashed or deposited more than three years before Rodrigue filed suit. Olin Br. at 2-3. As the parties have not undertaken to ascertain precisely which checks were negotiated within or without the limitations period, we will vacate the judgment and remand the case to the district court so that it may make an accurate determination on that point and modify the judgment accordingly.

**B. Comparative Fault**

As we noted previously in summarizing the district court's findings, the court rejected the notion that the "faithless employee" defense embodied in 810 ILCS 5/3-405(b) shielded Olin from liability altogether, and it likewise rejected Olin's contention that Rodrigue's own negligence barred her from recovering from Olin pursuant to 810 ILCS 5/3-406(a). The court therefore undertook to apportion liability for the loss of the converted checks according to the relative fault of Olin and Rodrigue. Although the court, in holding Rodrigue to account for 10 percent of the loss, implicitly recognized that Rodrigue bore some responsibility for not preventing Wiltshire's embezzlement, the court found Olin to blame to a much greater degree:

> On the one hand, Dr. Rodrigue did the best she could in running her solo medical practice, and relied on her accountants to provide sound business advice. She did what she was trained to do, and turned to outside advisers for matters beyond her expertise. On the other hand, Olin processed third-party insurance reimbursement checks as "paychecks" for one of its members for a period of almost eight years. They accepted two letters from a thief purportedly authorizing activity they themselves found "odd," "curious" and "strange." Though they sensed something suspicious was afoot, the Olin personnel failed by standards of reasonableness to protect all their members, concentrating instead on accommodating only one—Carol Wiltshire. Rather than properly verify that Dr. Rodrigue truly wished to pay her employee by the highly unorthodox method of third-party insurance reimbursement checks, Olin allowed the scam to run for almost eight years, at the cost to Dr. Rodrigue of nearly four hundred thousand dollars. Applying principles of comparative negligence . . ., the Court concludes that Olin's substantial negligence far outweighs Dr. Rodrigue's negligence in causing the loss.

> The Court apportions comparative fault as follows: Plaintiff's negligence is responsible for ten percent of her loss; Defendant's negligence is responsible for the remaining ninety percent of the loss.

R. 114 at 19-20 ¶ 36.

Olin contends that the district court's comparative fault determination was erroneous. In Olin's view, the record does not support the court's finding that it violated reasonable commercial standards in allowing Wiltshire to cash the insurance reimbursement checks. It points out that in making that finding, the court relied heavily on the plaintiff's expert, Ronald Wallace. Wallace had extensive experience with banks but not credit unions, Olin emphasizes, and many of the criticisms that he leveled against Olin and its practices vis-à-vis third-party checks were unrelated to the loss that Rodrigue suffered. The mere fact that Olin failed to detect that the endorsements on the checks were forged is not sufficient in and of itself to establish negligence, Olin stresses, given the large volume of checks that a credit union handles and its obligation to clear checks that comply with federal requirements. At the same time, Olin emphasizes that Rodrigue was far more to blame for the loss than the district court's 10-percent allocation suggests. Olin argues that Rodrigue was disinterested in the DOMS software that her office used to track billing and reimbursement: she did not seek training in how to use the software, nor did she ask for and review the types of DOMS reports that would have alerted her to the fact that Wiltshire was stealing insurance reimbursement checks. Rodrigue realized that she should be making more money than she was from her practice, but she did not take additional steps—e.g., having an audit conducted, or having additional staff members trained to use the DOMS software—that might have enabled her to identify the explanation for her stagnating earnings. Finally, although Rodrigue had amended her office procedures to provide that only she

would open her mail, she did not take adequate steps to communicate that policy to her staff or to enforce it.

The allocation of fault between two or more potentially responsible parties is a fact-based assessment that we review for clear error. *E.g.*, *Wolkenhauer v. Smith*, 822 F.2d 711, 717 (7th Cir. 1987). A finding is clearly erroneous when, on review of the record, this court "is left with a definite and firm conviction that a mistake has been made." *Cohen Dev. Co. v. JMJ Props., Inc.*, 317 F.3d 729, 735 (7th Cir. 2003) (quoting *Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 630 (7th Cir. 2001)).

Two provisions of the Illinois UCC are relevant to whether, and to what degree, Olin may be held responsible for Rodrigue's loss. Section 3-405(b), which incorporates what is known as the "faithless employee" defense, provides, in relevant part:

> For the purpose of determining the rights and liabilities of a person who, in good faith, pays an instrument or takes it for value or collection, . . . if an employer entrusted an employee with responsibility with respect to the instrument and the employee . . . makes a fraudulent indorsement of the instrument, the indorsement is effective as the indorsement of the person to whom the instrument is payable if it is made in the name of that person. If the person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to the loss resulting from the fraud, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.

810 ILCS 5/3-405(b). This provision "adopts the principle that the risk of loss for fraudulent indorsements by employees who are entrusted with responsibility with respect

to checks should fall on the employer rather than the bank that takes the check or pays it, if the bank was not negligent in the transaction." *Id.*, UCC Comment 1. That principle, in turn, recognizes that "the employer is in a far better position to avoid the loss by using ordinary care in choosing employees, in supervising them, and in adopting other measures to prevent forged indorsements on instruments payable to the employer . . . ." *Id.* A second provision, section 5/3-406, reflects a similar proposition stated in more general terms (not limited to employers) and, in addition, provides explicitly for the allocation of comparative fault when both parties failed to exercise ordinary care with respect to forged signatures on checks:

> (a) A person whose failure to exercise ordinary care substantially contributes . . . to the making of a forged signature on an instrument is precluded from asserting the alteration or forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.

> (b) Under subsection (a), if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.

810 ILCS 5/3-406. "Ordinary care" is defined, for purposes of these provisions, as follows:

> "Ordinary care" in the case of a person engaged in business means observance of reasonable commercial standards, prevailing in the area in which the person is located with respect to the business in which the person is engaged . . . .

810 ILCS 5/3-103(a)(7); *see also id.* UCC Comment 5 (definition of "ordinary care" applies to both banks and to

persons engaged in business other than banking). As these provisions collectively make clear, Olin may be held liable for the loss that Rodrigue suffered if it failed to observe reasonable commercial standards in accepting the third-party checks that Wiltshire presented and to the extent that its negligence contributed to Rodrigue's loss.

We find no clear error in the district court's finding that Olin violated reasonable commercial standards in allowing Wiltshire to cash Rodrigue's reimbursement checks and that its failure substantially contributed to Rodrigue's loss. Olin's fault lay not in its simple failure to detect Wiltshire's forgeries, but in its failure to inquire more closely into Wiltshire's authority to cash the checks notwithstanding the suspicions that those checks raised with Olin's personnel. Olin's own employees found it "odd," "strange," and "curious" that Wiltshire would be paid for her services to Rodrigue by way of third-party insurance reimbursement checks. It was their appreciation of the risk of fraud that prompted Olin to seek verification that Rodrigue had, in fact, endorsed the checks over to her. Yet, the credit union failed to proceed in a manner that was reasonably likely to rule out the possibility of fraud. But for one unsuccessful attempt to reach Rodrigue by phone, Olin made no effort to contact Rodrigue directly in order to confirm Wiltshire's authority to cash the checks. Instead, accepting Olin's account of events as true, the credit union relied entirely on two authorization letters (the second of which was notarized) that Wiltshire herself produced to the bank, both of which turned out to be phony themselves. Other than the letters and the unsuccessful telephone call, Olin made no effort whatsoever to confirm Wiltshire's bona fides. The letters themselves were not preserved, precluding any assessment at trial as to their apparent authenticity. The district court reasonably drew a negative inference from the disappearance of the letters—in other words, that the letters on their face might have hinted of a fraud and precluded Olin from reasonably relying on the letters.

Wallace, Rodrigue's banking expert, credibly testified that Olin failed to follow appropriate commercial procedures in accepting the third-party checks. Although Olin seizes upon Wallace's lack of experience and familiarity with credit unions as a reason to disregard his testimony, the issue on which Wallace testified was reasonable commercial standards as to third-party checks, and Olin made no showing that these checks are handled differently depending on whether they are presented to a bank or a credit union. More saliently, Olin points out that a number of the steps that Wallace faulted Olin for failing to take before accepting the insurance reimbursement checks from Wiltshire (for example, verifying the balance in Wiltshire's account at the credit union, or putting a hold on the proceeds of the checks for a period of time) were measures that would have protected Olin rather than Rodrigue. Arguably, however, Olin's failure to take such steps bespeaks an overall lack of due care with respect to those checks. In any case, in addition to steps that would have protected Olin, Wallace did single out an omission that would have protected Rodrigue, and that was the credit union's failure to seek direct verification from Rodrigue that Wiltshire had the authority to cash the checks and to periodically confirm that authority. In retrospect, it seems a matter of common sense that Olin should have made such an effort. Given Wallace's substantial background in banking in Southern Illinois, the district court was entitled to rely on his testimony in concluding that Olin failed to exercise ordinary care in its handling of the third-party checks.

As a result of the credit union's complaisance, Wiltshire was able to cash or deposit 269 checks worth $372,572.18 over a period of more than seven years. The district court certainly committed no clear error in concluding that Olin failed to exercise due care and that its failure substantially contributed to Rodrigue's loss. Olin therefore could not claim to be shielded from liability under sections 5/3-405(b)

or 5/3-406(a). The remaining question is the extent to which Olin's negligence contributed to the loss.

Certainly it is true that Rodrigue herself bore some responsibility for the loss. Although the district court declined to find Rodrigue negligent either in her decision to hire Wiltshire or in the management of her practice, in allocating 10 percent of the fault to her, the court necessarily found that she had failed to exercise due care in some respect. *See* § 5/3-406(b). As the head of her own practice, Rodrigue could be expected to take the reasonable steps that any small business owner would take to prevent embezzlement by an employee. Rodrigue hired Wiltshire, who it turns out had been convicted of embezzlement in 1987, and placed her in positions of increasing responsibility within the office. She gave Wiltshire total responsibility for entering billing and reimbursement data into the DOMS software without seeking training for herself or another staff member to serve as a check on Wiltshire. Although the record is silent as to what Rodrigue might have been told about how the DOMS software operated and what DOMS-generated reports she should review, the record does reveal that Rodrigue did not seek to familiarize herself with the system or to have the range of reports prepared that would have alerted her to the adjustments that Wiltshire was making in order to cover her embezzlement. Instead, she relied exclusively on accounts receivable reports, which lacked the clues that other reports would have given her to Wiltshire's fraud. Rodrigue herself realized that her income was not keeping pace either with her expectations or the growth in her patient load and hours. She can be faulted for entrusting a single staff member with the responsibility of handling her billing and reimbursement data and for failing to take more initiative in understanding and reviewing the DOMS reports that were available to her.

For these reasons, we reject the premise of Rodrigue's cross-appeal, which is that it was unreasonable for the dis-

trict court to assign her *any* responsibility for Wiltshire's embezzlement. Rodrigue emphasizes that she was neither an accountant nor a computer expert but a physician, and as such she lacked the knowledge that might have enabled her to detect Wiltshire's wrongdoing more readily. She regularly reviewed DOMS-generated reports on her accounts receivable, and those reports did not supply clues as to Wiltshire's embezzlement. For additional information and advice on the financial state of her practice, she relied on her accountants, who themselves did not suspect embezzlement or encourage her to have an audit conducted. In terms of her office mail, from which Wiltshire stole the checks, she had instituted a policy forbidding anyone but herself from opening the mail. And when she noticed that she was not receiving expected reimbursements from insurers, she contacted the insurers and, rather than being told the checks had been sent, was told that the payments were delayed due to difficulties with billing and processing. The district court itself considered all of these points and agreed that they absolved Rodrigue of most of the responsibility for the loss. But the court reasonably concluded that Rodrigue could not be absolved of *all* responsibility. She not only hired Wiltshire but placed her in a position of unchecked control over the DOMS entries. Moreover, although Rodrigue had amended her office manual to provide that only she would open the mail, the record tends to confirm Olin's argument that this policy was not adequately communicated to her staff. Denise Rodrigue, for example—the very individual who caught Wiltshire's embezzlement—was unaware of that policy. That may help to explain why Wiltshire was able to lift checks from the mail as freely as she did for more than seven years.

It is noteworthy, however, that Rodrigue consulted with three different accounting firms during the nearly seven-year period in which Wiltshire was embezzling, and none of them explored the possibility of fraud either. When

Rodrigue raised with the accountants her frustration with her stagnating income, they suggested that the problem was with the rates at which insurers were willing to reimburse her for the services she provided to her patients. They urged her to focus on weeding out poor insurance plans.

On these facts, the district court reasonably concluded that Olin bore more responsibility for Rodrigue's loss than the doctor herself did. Wiltshire's embezzlement scheme could not have succeeded without a bank or credit union's willingness to accept the third-party checks she fraudulently endorsed. In contrast to Rodrigue, who never realized that her office had received the checks that Rodrigue stole, Olin was presented with each of the stolen checks and from the beginning appreciated that something with the checks might be amiss. Nonetheless, after soliciting and obtaining from Wiltshire herself proof of her authority to cash the checks, Olin was content to allow her to cash or deposit hundreds of checks worth several hundred thousand dollars. Olin had the opportunity upon presentation of each check to inquire further into a scenario that its own employees felt was unusual; but in the seven years that Wiltshire perpetrated her scheme, the credit union did not pursue those opportunities.

Although a different factfinder might have allocated the fault as between Rodrigue and Olin differently, we have no conviction, let alone a definite and firm one, that the district court was mistaken in holding Olin responsible for 90 percent of the loss. Olin was on notice of and recognized the suspicious nature of Wiltshire's negotiation of the checks and appreciated the need to confirm that Rodrigue had actually endorsed the checks over to Wiltshire. Yet, it accepted as sufficient proof of Wiltshire's authority to cash the checks evidence that was as readily forged as Rodrigue's endorsement. And it continued to accept that proof as sufficient despite the large number of checks, adding up to an extremely large total, over a period of many years.

## III.

Wiltshire's embezzlement of multiple checks from her employer did not amount to a single transaction or continuing violation under Illinois law. Accordingly, a cause of action for conversion accrued, and the three-year statute of limitations began to run, at the time each check was cashed or deposited. The limitations period thus had expired on any conversion claims based on checks cashed more than three years before Rodrigue filed suit. We therefore VACATE the judgment and REMAND the case to the district court so that it may modify the judgment to include only those checks cashed within three years of Rodrigue's suit. We AFFIRM the district court's allocation of comparative fault as between Rodrigue and Olin. The parties shall bear their own costs of appeal.

A true Copy:

      Teste:


              _____
              *Clerk of the United States Court of*
              *Appeals for the Seventh Circuit*