In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3897

Kevin Lee Otto,

Petitioner,

v.

Securities and Exchange Commission,

Respondent.

On Petition for Review of an
Order of the Securities and Exchange
Commission File No. 3-9938.

Argued April 17, 2001--Decided June 12, 2001

Before Fairchild, Cudahy, and Coffey,
Circuit Judges.

Coffey, Circuit Judge.  On September 15,
2000, the Securities and Exchange
Commission ("SEC" or "Commission") issued
an order pursuant to the Securities
Exchange Act of 1934, 15 U.S.C. sec.
78s(d)(1), affirming disciplinary action
taken by the National Association of
Securities Dealers, Inc. ("NASD") against
Kevin Otto. Otto, a securities salesman
associated with an NASD member firm at
the time of the misconduct charged, seeks
review of the SEC order pursuant to 15
U.S.C. sec. 78y(a)(1). We deny Otto's
petition and affirm the SEC's order.

I.  Factual Background

   During all times relevant to the
disposition of this case, Kevin Otto
worked as a general securities
representative for various NASD member
firms including Hamilton Investments,
Inc., Wellington Investment Services
Corporation, and First Montauk Securities
Corporation. Mary Sue Smith/1 became a
client of Otto's beginning in 1988 or
1989 and followed him through his various
firm transfers.

   In February 1992, Otto solicited $22,000
from Smith for an investment in the
Wisconsin Business Club ("WBC"). In a

letter to Smith Otto explained that:

WBC is a group of people that network to bring to the table business opportunities which enable me to make some cash. These are opportunities that you and I as individuals probably wouldn't see. . . . Again as I stated on the phone this is not an investment nor is it offered by any securities company. It has nothing to do with me as a broker or my brokerage firm. This is a private thing. It is kind of fun. I think you'll like it. . . . Liquidity depends on what the funds are in.

Otto further professed that the return was reported as a Treasury Bill rate "plus a couple of percentage points." Smith provided Otto with the $22,000; unbeknownst to her, WBC did not exist.

Rather than invest the $22,000 into WBC as he had suggested he would, Otto instead placed the $22,000 partly in his personal bank account and partly in a Charles Schwab account for PowerSource Battery Corporation, an unprofitable company that he owned and operated with a partner, Donna LeBrecht. Otto used Smith's funds for "personal stuff," business expenses related to the operation of PowerSource, and expenses related to the investigation of other business opportunities. Despite the illicit infusion of capital, PowerSource filed for bankruptcy protection in March of 1992.

To cover up his misuse of her funds, Otto prepared and sent to Smith fictitious portfolio updates that falsely reflected a WBC balance. In April 1994, Smith requested funds from her WBC account. Because he could not immediately return Smith's money, Otto stalled the repayment with more deceit, explaining in a letter that "the invest[ment] club has invested cash. May take a few weeks to find a replacement for your position. . . . Once we sell your seat, we are out unless another opens up." In May, he wrote to Smith that her account's value was $28,576.24 and he had arranged for "all dividends and/or capital gains to date" to be forwarded to Smith. Otto further explained to her that it could take a few weeks to liquidate, and suggested that she withdraw approximately $3,000 immediately, leaving $25,000 in

the club to remain active, thus attempting to prolong the charade that he had invested Smith's money in WBC. Smith signed an authorization agreeing to leave $25,000 in the fictitious club, and received a personal check form Otto in the amount of $3,576.24 in June 1994. Initially the check was returned for insufficient funds, but later Smith was able to deposit it.

Because of the two-month delay between her request and her receipt of the WBC funds, Smith decided to withdraw all of the WBC funds. Still, Otto did not immediately return Smith's money. In a letter dated July 27, 1994, he continued to represent that WBC existed as a legitimate investment club and blamed the delay in receiving her money on the investment club.

I've not yet received our exit papers for the investment club. As your request is unusual things don't happen that fast. The group has assured me that funds will not be less than its value at the time the funds were requested. . . . This is an exclusive club with most people of professional investment background. I pushed to get us in, therefore I can't cause a lot [sic] wave[s]. I should hope to receive our exit papers soon and subsequently the funds.

Otto finally sent Smith a check for $26,346 (the fictitious balance of Smith's WBC account) on October 22, 1994, approximately six months after her initial request to withdraw her funds.

In October 1994, Smith sent to Otto's then-employer, First Montauk Securities Corporation, copies of records and letters Otto had sent her regarding her WBC account. Nearly thirty months later, on March 14, 1997, NASD filed a complaint against Otto, charging him with violating Conduct Rule 2110, which requires members to "observe high standards of commercial honor and just and equitable principles of trade." At a subsequent hearing before the NASD Regional District Business Conduct Committee ("DBCC"), Otto admitted that WBC did not exist as anything other than an "insignia."  Otto claimed, however, that Smith had authorized him to use the funds as he did. According to Otto, Smith faced marital difficulties and wanted to use WBC in order to hide

the money from her then-husband. Otto further claimed that the only reason Smith made a complaint against Otto was because of the request of her father, also one of Otto's clients, who was upset with Otto's handling of his account. Smith's complaint was admitted into evidence at the hearings, but she did not testify. On August 7, 1998, the DBCC found that Otto violated Conduct Rule 2110 and imposed a penalty composed of a censure, a permanent bar from associating with any NASD member, a fine of $110,000, and an assessment of costs in the amount of $3,110.75.

Otto appealed the DBCC's decision to the National Adjudicatory Counsel ("NAC") for NASD. At the hearing before the NAC, Otto again admitted that WBC never existed and that he used Smith's funds for his business and personal expenses. Again Smith did not testify. The NAC found that "Otto's misuse of [Smith's] funds was inexcusable. His misconduct, coupled with his total refusal to acknowledge that he had misused his client's funds by using her money for his own personal and business benefit, makes him a danger to the investing public." Further, in its decision, the NAC explained that even though the guidelines did not recommend a bar for Otto's conduct, it considered a bar "essential based on the egregious nature of Otto's conduct." In support, it noted three aggravating factors: 1) the series of lies and deception beginning with his solicitation of Smith's funds and continuing throughout her attempts to withdraw her funds; 2) his failure to accept responsibility for his misuse of Smith's funds; and 3) his attempt to lay blame on others, specifically upon Smith herself with his theory that she attempted to use WBC to hide the money in a marital dispute. Accordingly, on June 28, 1999, the NAC affirmed the censure and bar, but reduced the fine to $35,000 because it concluded that the DBCC used a "conversion" sentencing guideline rather than an "improper use of funds" guideline.

Otto appealed the decision of the NAC to the SEC, which reviewed his case de novo. On September 15, 2000, the SEC sustained the censure, bar, $35,000 fine, and costs. The SEC found that Otto "deceived his client with a network of lies." The SEC pointed out that, by his own

admission, the investment club into which Otto told Smith he had placed her funds did not exist. The SEC further found that when Smith sought to get her money back, Otto repeatedly delayed returning her money and continued the fiction of the investment club, failing to tell Smith that he used her money for his own benefit. The SEC found that Otto's admittedly false statements to Smith demonstrated "deception of a client about the use of money [that] is unethical and reprehensible." In addition, the SEC rejected Otto's procedural objections, finding that the NASD proceedings were fair, noting that Otto admitted "all of the facts necessary to determine his guilt." Finally the SEC held that the sanctions imposed by the NASD were not excessive or oppressive, concluding that Otto's conduct "demonstrates a serious misunderstanding of the obligations he owes to a customer as a registered representative." Otto now appeals.

## II.  Issues

Otto raises two issues in his appeal. First, he contends that the NASD proceedings violated his due process rights because hearsay evidence was admitted and relied upon, because he did not have the opportunity to cross-examine Smith, and because the length of time that passed between the misconduct and the hearings deprived Otto of the opportunity to present witnesses on his behalf who had died during the delay. Second, Otto argues that the SEC abused its discretion in sustaining the NASD sanctions that exceeded the recommended sanctions under the NASD guidelines.

## III.  Analysis

The SEC is the federal agency charged with the regulation of the securities industry, but because the SEC lacks the resources to police the entire securities industry, it relies on participants in the markets to govern themselves. See Gold v. SEC, 48 F.3d 987, 990 (7th Cir. 1995); Mister Discount Stockbrokers, Inc. v. SEC, 768 F.2d 875, 876 (7th Cir. 1985). The NASD is a registered association of securities broker-dealers registered with the SEC pursuant to 15 U.S.C. sec. 78o-3(a) and empowered to enforce association members' compliance with federal securities laws, Commission

regulations, and the association's own rules and regulations by imposing appropriate sanctions. When enforcing members' compliance with applicable rules and regulations, the NASD must provide "a fair procedure for the disciplining of members and persons associated with members . . . ." 15 U.S.C. sec. 78o-3(b)(8); Mister Discount Stockbrokers, Inc., 768 F.2d at 876.

The disciplinary process established by the NASD provides that the NASD Regional District Business Conduct Committee has original jurisdiction of all complaints regarding member violations and may conduct hearings, make findings and impose penalties. Id. In turn the final actions taken by the District Committee are subject to review by the NASD Board of Governors. Any final disciplinary sanctions imposed by the Board of Governors is subject to "full and independent review by the SEC as to the facts as well as the law." Gold, 48 F.3d at 990; 15 U.S.C. sec. 78s(d)(2). Because the SEC conducts de novo review of the NASD's sanctions, this court's consideration of alleged errors in the NASD proceedings is limited. We will "consider errors in [the NASD] proceedings 'only if and to the extent that they infected the Commission's action by leading to error on its part.'" Schellenbach v. SEC, 989 F.2d 907, 909 (7th Cir. 1993); accord Gold, 48 F.3d at 990; Mister Discount Stockbrokers, Inc., 768 F.2d at 877.

Our review of the proceedings before the SEC is not so limited. Gold, 48 F.3d at 990. This court may overturn an SEC sanctions order if it is unwarranted in law or without justification in fact. Id. (citing Nowicki v. United States, 536 F.2d 1171, 1178 (7th Cir. 1976)). Nevertheless, our review of the SEC's findings of fact is highly deferential. Indeed, the SEC's findings of fact are conclusive if supported by substantial evidence. Schellenbach, 989 F.2d at 909. Further, we will reverse the Commission decisions concerning sanctions only if this court finds that the SEC abused its discretion. Id.; Mister Discount Stockbrokers, Inc., 768 F.2d at 879. With this limited scope of review in mind, we turn to Otto's arguments.

A.  Fairness of NASD Proceedings

Otto initially argues that the NASD proceedings violated his due process rights urging three separate grounds: 1) the NASD admitted into the record Smith's unsworn hearsay statements; 2) the NASD did not provide him with an opportunity to cross-examine Smith; 3) a six-year delay between the time of the misconduct and the date of the hearing prejudiced him because he could not call favorable witnesses who had died. None of Otto's arguments has merit.

We note at the outset that Constitutional standards do not apply unless the NASD is a state actor. See R.J. O'Brien & Assoc., Inc. v. Pipkin, 64 F.3d 257, 262 (7th Cir. 1995). The fact that the NASD is subject to "extensive and detailed" governmental regulation does not necessarily convert that organization's actions into those of the state. See Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350 (1974). Indeed, although we have not expressly ruled on the question of whether the NASD is a state actor, we have previously expressed doubt about "the proposition that the comprehensive regulation of securities exchanges by the federal government would turn those exchanges into government actors." Gold, 48 F.3d at 991 (suggesting that the New York Stock Exchange was not a state actor, but declining to rule on the merits of that issue because petitioner had waived the argument on appeal). In addition, several of our Sister Circuits have reached the conclusion that the NASD is not a state actor. See, e.g., Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 206 (2d Cir. 1999) (noting that the NASD is a private corporation that receives no federal or state funding; that its creation was not mandated by statute; and that the government has no voice in the selection of its members); First Jersey Sec., Inc. v. Bergen, 605 F.2d 690, 699 n.5 (3d Cir. 1979). In any event we need not decide the issue of whether the NASD is a state actor in this case because Otto admitted all of the facts necessary to establish his guilt, which dooms his due process arguments.

At his hearing before the NASD Board of Governors, Otto admitted, among other things, that WBC was fictional, that Smith was the only investor, and that he

used Smith's funds for his "personal stuff." Further, when Smith requested to withdraw her WBC funds in April 1994, Otto continued his deception and delayed returning her money. First, he explained to her that it could take a few weeks to find a replacement and urged her to instead remain in the club. Later, Otto sent her a letter blaming the non-existent club for the delay in the return of her money. Ultimately, he continued his deception long enough to retain her money for six months after she initially requested it.

Despite his admissions, Otto nonetheless presses the argument that he somehow was prejudiced by Smith's absence at his hearings. The premise of Otto's argument is that if he were allowed to cross-examine Smith/2 she would have confirmed his explanation that she used WBC to hide assets from her husband and that she had given him permission to use the funds for his personal and business expenses. Otto's argument, however, is nothing more than pure fancy. First, there was no evidence that Smith had any prejudice against Otto that might have undermined the credibility of her complaint. Second, the facts of her complaint were not contradicted by any direct testimony, and instead were largely corroborated by Otto's own admissions. Moreover, Smith's former husband did testify at the hearing and expressly rejected Otto's assertion that the parties were contemplating divorce or separation during the time Smith had invested in WBC. Finally, Otto's letters to Smith reveal the utter incredibility of his assertion that Smith was using WBC to hide assets from her husband--for if Smith had been aware that WBC did not exist (as Otto suggests she was) then what need was there to persist in blaming the delay in the return of her funds on the non-existent club? Otto's argument has no foundation in fact. Furthermore, even if it did, it is well established that hearsay evidence is admissible in administrative proceedings, if it is deemed relevant and material. Keller v. Sullivan, 928 F.2d 227, 230 (7th Cir. 1991) (citing Richardson v. Perales, 402 U.S. 389 (1971)). In addition to its relevance, Smith's complaint was supported by several indicia of reliability--most notably the corroboration from Otto's admissions.

Otto also suggests that the delay in holding the hearing violated his due process rights because several witnesses, who would have testified that they participated in the WBC, died before the hearing was held. This claim is equally fanciful as Otto's claim that his due process rights were violated by his inability to cross-examine Smith. The testimony of these witnesses would have largely been irrelevant. Otto admitted that he used Smith's money for his business and personal expenses and whether other people had invested in the fictitious club he created is of no moment. Further, Otto admitted at the hearing that, besides himself, Smith was the only investor in WBC, thus directly contradicting the testimony he suggests he would have presented.

Given Otto's admissions coupled with the incriminating documentation he sent throughout her investment, Otto's claims that the proceedings were unfair and violated his due process rights must fail. Rule 2110 required Otto to "observe high standards of commercial honor and just and equitable principles of trade." Nothing in the record even remotely suggests that an error in the NASD proceedings infected the SEC's review. Consequently, our review is limited only to consideration of whether the SEC abused its discretion in holding that Otto violated Conduct Rule 2110. It did not. Otto's admissions and letters to Smith more than amply provide a basis to conclude that Otto did not "observe high standards of commercial honor and just and equitable principles of trade."

B.  Severity of Sanctions

Otto next argues that the sanctions imposed exceeded the recommended sanctions under the NASD's guidelines, and thus, were improperly imposed. Otto also suggests that the NASD and SEC did not weigh all of the factors referenced on the NASD's sanction guidelines in reaching their determinations that the sanctions imposed were warranted. The NASD outlines eight factors relevant to imposing sanctions: 1) prior or other similar misconduct; 2) attempts to conceal conversion, misappropriation, or misuse; 3) forgery of documentation or customer's signature; 4) duration of the

period the securities or funds were converted; 5) essentially stealing versus mistaken belief of authority to use; 6) value of converted, misappropriated or misused funds or securities (loss to customer); 7) prompt and voluntary restitution, clear evidence that the funds or securities were returned to the customer; 8) other aggravating or mitigating factors. The sanction guidelines, however, are not rigid andmechanical and serve only as a starting point for determining the proper disciplinary action. In the Matter of Steven D. Goodman, 2001 WL 62607 (S.E.C.) at *5 (Jan. 26, 2001).

Otto comingled Smith's funds with his own for the sake of his own personal convenience and deprived her of the opportunity to invest those funds in a legitimate investment. Further, he concealed this use of funds from Smith. Although he did ultimately return the funds, he put her funds at risk for more than two years. When Smith asked Otto to return her money, he continued to lie to her, attempted to convince her to leave her money invested in the fictitious WBC account, and only returned her money after six months. Given the ongoing deception in the face of a request for the return of her funds and Otto's refusal to accept responsibility for his misuse of Smith's funds, we agree with the SEC's decision to approve the NASD's imposition of sanctions.

The SEC's order is AFFIRMED.

FOOTNOTES

/1 During the course of events that gave rise to this appeal, Smith changed her name to Mary Sue Laskowski. For convenience sake, we refer to her throughout this opinion as "Smith."

/2 In an attempt to secure Smith's presence, Otto's attorney sent to her a "subpoena." The document bears the indicia of the NASD (despite the fact that neither the NASD nor Otto himself had sub-poena power) and "commands" her to appear with documents, falsely threatening her with punish-ment for contempt if she failed to comply. Otto's attempt to badger and even intimidate Smith into testifying only further undermines his claims and further suggests that he did not "observe high standards of commercial honor."