In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2896

CARL M. BIRKELBACH,

*Petitioner*,

*v.*

SECURITIES AND EXCHANGE
COMMISSION,

*Respondent.*

Petition for Review of an Order of the Securities and Exchange
Commission.
No. 3-14609

ARGUED APRIL 1, 2014 — DECIDED MAY 2, 2014

Before TINDER and HAMILTON, *Circuit Judges*, and KAPALA,
*District Judge*.[*]

KAPALA, *District Judge.* Carl Birkelbach seeks review of a
Securities and Exchange Commission ("SEC") order barring
him for life from participation in the securities industry. In his

---

[*] The Honorable Frederick J. Kapala of the United States District Court for
the Northern District of Illinois, sitting by designation.

petition, Birkelbach contends that the SEC's order was erroneous because the original disciplinary complaint was untimely and the lifetime bar was an excessive punishment. For the following reasons, we deny the petition.

## I. BACKGROUND

### A. The SEC's Regulatory Structure

"The SEC is the federal agency charged with the regulation of the securities industry, and, because the SEC lacks the resources to police the entire industry, it relies on industry members to promote compliance with the securities laws and regulations and to pursue enforcement actions." *Gold v. S.E.C.*, 48 F.3d 987, 990 (7th Cir. 1995). The Financial Industry Regulatory Authority, Inc. ("FINRA") is a not-for-profit self-regulatory organization formed under the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*-3, which was created in 2007 following the consolidation of the National Association of Securities Dealers, Inc. ("NASD") and portions of the New York Stock Exchange Regulations, Inc.[1] *See William J. Murphy*, Exchange Act Release No. 69923, 2013 WL 3327752, at *1 n.1 (July 2, 2013). FINRA is empowered to bring disciplinary actions and impose sanctions to enforce its members' compliance with federal securities laws, SEC regulations, and

---

[1] At the outset of the investigation in this case, FINRA was not yet in existence and the NASD rules applied. For ease of understanding, and because there is no meaningful distinction between the entities or rules as they apply in this case, we will simply refer to FINRA and its predecessor as "FINRA."

FINRA's own rules and regulations.[2] *See Otto v. S.E.C.*, 253 F.3d 960, 964 (7th Cir. 2001). A member can appeal the disposition of a FINRA disciplinary proceeding to the SEC, which performs a *de novo* review of the record and issues a decision of its own. *See id.* From there, an aggrieved individual can petition this Court for review of the SEC's order.

## B. Factual Background

The facts are drawn from the SEC's factual findings, which Birkelbach does not challenge. In 1983, Birkelbach founded Birkelbach Investment Securities ("BIS") and served as its president. Birkelbach was registered in several capacities as a general securities representative and principal, a municipal securities representative and principal, an options principal, and a financial and operations principal.[3] In 1995, William J.

---

[2] The SEC must approve FINRA's rules which, once adopted by the SEC, have the force of law. *See McDaniel v. Wells Fargo Invs., LLC*, 717 F.3d 668, 673 (9th Cir. 2013). The SEC also retains the authority to "abrogate, add to, and delete from all FINRA rules as it deems necessary." *Aslin v. Fin. Indust. Regulatory Auth., Inc.*, 704 F.3d 475, 476 (7th Cir. 2013).

[3] FINRA's rules, which incorporate some of the older NASD rules, define principals as "[p]ersons associated with a member [firm] … who are actively engaged in the management of the member's investment banking or securities business, including supervision, solicitation, conduct of business or the training of persons associated with a member for any of these functions." NASD Rule 1021(b). By contrast, the rules define representatives as "[p]ersons associated with a member [firm], including assistant officers other than principals, who are engaged in the investment banking or securities business for the member including the functions of supervision, solicitation or conduct of business in securities or who are

(continued...)

Murphy became associated with BIS. The facts pertinent to Birkelbach's petition revolve around Murphy's actions on two BIS accounts—the accounts of Amy Lowry and Benjamin Martinelli—and Birkelbach's supervision of those actions.

### 1. The Lowry Account

In October 2001, Lowry, an unsophisticated investor, opened an account with Pat Jage at BIS. The account was funded with shares of Procter and Gamble ("P&G") stock which she received from her father valued at approximately $1.5 million. The account opening documents noted that her goals were "income," "long-term growth," and "income & appreciation." She set out her willingness for risk exposure as "moderate." However, due to an emotional attachment, Lowry did not want to sell the P&G stock. Accordingly, Lowry approved her account for "covered writing."[4] This approval was reviewed and signed by Birkelbach. Jage managed the account utilizing a covered writing strategy until he left in July 2002. At the time of Jage's departure, the account was valued at approximately $1.7 million.

Following Jage's departure, Birkelbach transferred Lowry's account to Murphy, who controlled the account from July 2002

---

[3] (...continued)
engaged in the training of persons associated with a member for any of these functions." NASD Rule 1031(b).

[4] Covered writing is a relatively conservative investment strategy which involves "the purchase of stock and simultaneous sale of options based on that stock." *Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 526 (9th Cir. 1986).

to February 2006. Almost immediately upon transfer, the trading activity in the account increased dramatically. Indeed, during the period between November 2004 and January 2006, Murphy traded between 4,000 and 8,000 option contracts a month on the account. Murphy also engaged in "round-trip" trading, which is the practice of selling and then buying back the same options contract for nearly the same price in order to generate additional transactions and fees without generating any profit.[5] In total, Murphy generated over a million dollars in commissions from the Lowry account, and rapidly incurred substantial losses and a large margin debt balance.

In addition to increasing the activity in the account, Murphy also engaged in many transactions that were not part of the covered writing strategy authorized by Lowry. Despite the fact that Murphy spoke with Lowry on at least a monthly basis, he never informed her that he was pursuing trades outside of the covered writing strategy. Murphy's misconduct was facilitated by Lowry's inability to understand her monthly statements, many of which included inconsistencies and errors which overvalued the profitability of the account. Murphy's commissions from the Lowry account alone made up a stunning 18% of BIS's total revenues during the time Murphy controlled the account.

---

[5] "Round-trip" trading is one form of churning. "The term 'churning,' in the context of securities regulation, denotes a course of excessive trading through which a broker advances his own interest (*e.g.*, commissions based on volume) over those of his customer." *Costello v. Oppenheimer & Co.*, 711 F.2d 1361, 1367 (7th Cir. 1983).

Birkelbach supervised Murphy's activity in the account until Lowry closed it in early 2006. He was required to approve all options trades. He also reviewed all trading activity daily, ostensibly to ensure it was prudent and within the parameters of Lowry's investment strategy. In addition, he reviewed the profit and loss reports and account correspondence. George Langlois, who served as BIS's compliance officer during the time Murphy managed the Lowry account, frequently raised issues with Birkelbach concerning Murphy's trading activity in the account. Birkelbach permitted Langlois to send activity letters to Lowry, showing that there was a "high level of activity" in her account. However, Birkelbach never followed up with Lowry to check on her authorization of Murphy's activities and never disapproved of any of the trades made by Murphy in her account.

Birkelbach also knew that Murphy had been previously censured, suspended, and fined by the Chicago Board Options Exchange, Inc., for trading without prior client authorization. Furthermore, Birkelbach was aware that Murphy had a history of customer complaints and arbitrations to resolve those complaints. Birkelbach himself also had a previous disciplinary history. He was sanctioned in 1999 by the Illinois Securities Department with a six-month suspension and ordered to make restitution for unauthorized trading, unsuitable transactions, churning accounts, and excessive trading (the same things Murphy did in the instant matter). In November 2005, FINRA requested that Birkelbach place Murphy on heightened supervision based on its investigation into Murphy's behavior on the Lowry account, but Birkelbach did not do so.

## 2. The Martinelli Account

In 1999, Martinelli, while a college student, opened an account at BIS with Langlois managing the account. Under Langlois' management, the account grew from the initial deposit value of $2,500 to over $18,000. Birkelbach transferred the account to Murphy in 2007 when Langlois left BIS. At that time in 2007, Martinelli was a member of the United States military stationed in Germany. Martinelli and Murphy discussed changing the strategy Langlois had used to handle the account, and, although Martinelli responded positively to the prospect, he requested some time to consider Murphy's suggestions.

Despite that request, and without written authorization, Murphy began actively trading in Martinelli's account immediately. Because of a delay in receiving his international mail, Martinelli's statement for April 2007, which was the first month Murphy had control over his account, was not received until late May or early June. Murphy's unapproved trading had resulted in a 17% drop in the account's value in that single month. Martinelli contacted Murphy, who blamed the issue on a misunderstanding of his authority. Murphy also said that another month of trading had resulted in additional losses and the account was now only worth approximately $13,000. Murphy offered to refund $3,000 in commissions. Martinelli directed Murphy to stop trading on his account and to transfer it to Langlois at his new firm.

In reality, the value of the account had plummeted to just over $10,000, a drop in value of approximately 45% in only two

months. In July 2007, after he received the May statement, Martinelli called both Murphy and Birkelbach to complain. He also forwarded a complaint to FINRA.

Birkelbach's supervisory responsibilities were the same as with the Lowry account. However, at the time Birkelbach assigned Martinelli's account to Murphy, he was aware of the FINRA investigation into the Lowry account and had already received the request to place Murphy under close supervision. Despite knowing Murphy's past habits of acting without authorization, and knowing that Murphy was continuing to do so with Martinelli's account, Birkelbach never disapproved of any of Murphy's trades.

### C. Procedural Background

In November 2005, after a routine examination of BIS's trading in the Lowry account, FINRA launched a formal investigation. On July 30, 2008, FINRA's Department of Enforcement ("DOE") filed a nine-cause complaint against Murphy, Birkelbach, and BIS. A FINRA hearing panel held a four-day hearing and determined there were violations on seven of the causes charged, including the single cause against Birkelbach individually which alleged that he failed to adequately supervise Murphy in violation of NASD Rules 3010(a) and 2860(b)(20). Rule 3010(a) requires a member firm to "establish and maintain a system to supervise the activities of each registered representative … that is reasonably designed to achieve compliance" with applicable laws, regulations, and rules. Rule 2860(b)(20) requires "diligent supervision of all customer accounts" and specifies that the ultimate duty to supervise accounts falls to the member's senior options

principal. As a result of their findings, the hearing panel barred Murphy from associating with any member firms for life and ordered him to pay nearly $600,000 in disgorgement. The panel suspended Birkelbach for six months in two of his capacities—as a general securities principal and an options principal—and fined him $25,000. The panel also fined BIS $2,500.

Murphy, Birkelbach, and BIS appealed that ruling to FINRA's National Adjudicatory Council ("NAC"), which provides an independent review of the case. The NAC affirmed the finding of all seven violations. It also affirmed the punishments against Murphy and BIS, except that it ordered the disgorgement penalty against Murphy to be lowered slightly. Of import to this case, it found that the hearing panel's sanction against Birkelbach was "wholly insufficient to remedy his failure to supervise" and that his "conduct reflect[ed] a shocking disregard for FINRA rules." *William J. Murphy*, Complaint No. 2005003610701, 2011 WL 5056463, at *35, *37 (FINRA Oct. 20, 2011). Accordingly, the NAC increased the sanction against Birkelbach to include a lifetime bar from association with any member firm in any capacity.

From there, Murphy and Birkelbach appealed to the SEC. The SEC engaged in a *de novo* review of the original record and made its own findings. In particular, it found that Murphy had engaged in trading without authorization, churning the accounts for fees, making unsuitable recommendations to Lowry, excessive trading, and providing misleading communications to Lowry. Accordingly, the SEC affirmed the sanctions against Murphy. Additionally, the SEC found that Birkelbach violated several relevant rules which establish his

duty to maintain reasonable supervision of Murphy, including failing to investigate the many red flags raised throughout Murphy's handling of both accounts. It went on to hold that "Birkelbach's supervisory failures [we]re egregious and that a bar in all capacities is an appropriate sanction, one necessary to protect the investing public from further harm." *William J. Murphy*, 2013 WL 3327752, at *27. Thus, the lifetime bar in all capacities was affirmed.

Now Birkelbach petitions this Court for review of the SEC's ruling. Birkelbach does not take issue with the finding that Murphy violated assorted duties to Lowry and Martinelli or the finding that Birkelbach violated his supervisory duties by failing to reasonably supervise Murphy. Instead, he argues that (1) the July 30, 2008 complaint was untimely because it was filed more than five years after Birkelbach began supervising agents who managed Lowry's account, and (2) the lifetime bar was excessive.

## II. ANALYSIS

Our review of SEC decisions is limited. We may only overturn a SEC disciplinary order if it "is unwarranted in law or without justification in fact." *Otto*, 253 F.3d at 964. Any finding of fact by the SEC is binding on this Court "if supported by substantial evidence," which means that the finding need only be supported by evidence sufficient to support a reasonable factfinder's decision. *Monetta Fin. Servs., Inc. v. S.E.C.*, 390 F.3d 952, 955 (2004). Furthermore, we will only disturb the SEC's choice of a particular sanction if the choice was an abuse of discretion. *Otto*, 253 F.3d at 964.

## A. Statute of Limitations

Birkelbach first argues that the five-year statute of limitations set out at 28 U.S.C. § 2462 bars the disciplinary action in its entirety. Section 2462 provides that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued … ." The disciplinary complaint was issued by FINRA on July 30, 2008, and Murphy began handling the Lowry account in July 2002. Thus, Birkelbach argues, the complaint was beyond the statute of limitations.[6]

The SEC rejected the statute-of-limitations challenge on two grounds. Initially, the SEC opined that § 2462, which typically only applies to government agencies, does not apply to FINRA, which is a private self-regulatory organization, and, therefore, is not a government entity. In an alternative holding, the SEC found that even if § 2462 applied, "it would not bar FINRA's action here because the vast majority of the violative

---

[6] Other than in a footnote in the reply brief, Birkelbach ignores the Martinelli account entirely in his statute-of-limitations argument. This is a curious omission, as the entirety of the failure to supervise Murphy's control of Martinelli's account fell within the five years prior to the DOE's complaint. At oral argument, Birkelbach's attorney conceded that the Martinelli account activity happened entirely within the statute of limitations, but described the devaluation of Martinelli's account by nearly 50% through unauthorized trading and churning as "de minimis." In any event, because we reject the statute-of-limitations argument as it applies to the Lowry account, we need not determine if the Martinelli account misbehavior by itself could justify the lifetime bar imposed.

conduct in this case occurred within five years of FINRA's filing its complaint, and all of the violations culminated within that period." *William J. Murphy*, 2013 WL 3327752, at *23.

However, Birkelbach argues that failure to supervise Murphy was a single indivisible act which accrued on the day of the first failure to supervise and the fact that it continued thereafter is irrelevant for purposes of the statute of limitations.[7] The SEC, however, rejected that view in its alternative holding, concluding that an ongoing series of violations of the duty to reasonably supervise Murphy is continuing and divisible such that it could consider the timely violative conduct, even if there was additional untimely violative conduct. Specifically, the SEC was willing to look at "conduct by Applicants sufficient to sustain each of the violations under review [which] continued until well after July 30, 2003—the date five years before FINRA issued its complaint," *William J. Murphy*, 2013 WL 3327752, at *23, thereby rejecting the idea that a failure to supervise is an indivisible act. The SEC's interpretation of the continuing duty to supervise is correct.

---

[7]   In his reply brief, Birkelbach also addresses—and argues against—the applicability of the continuing-violations doctrine. This doctrine, if applicable, would permit the SEC to consider untimely violative conduct so long as there was some timely violative conduct and the conduct as a whole can be considered as a single course of conduct. *See Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 690 (7th Cir. 2001). We need not address whether this doctrine applies here as the SEC found in its alternative holding that the timely conduct alone was sufficient to justify finding all of the violations of Birkelbach's supervisory duties.

Indeed, if we were to accept Birkelbach's interpretation—that failure to supervise is a single indivisible act which begins on the first day of unethical supervision—the result would be absurd. Under his interpretation, if an unethical supervisor were to avoid detection for five years, he could continue his unethical behavior *forever* without FINRA or the SEC being able to discipline him. *See Chowdhurry v. Ashcroft*, 241 F.3d 848, 853 (7th Cir. 2001) ("Regulations are created to provide guidance and uniformity to an agency's decision-making. Those regulations, however, should not be so strictly interpreted as to provide unreasonable, unfair, and absurd results."). The rules contemplate a continuing duty to reasonably supervise, and any violative conduct that falls within the statute of limitations is independently sanctionable, regardless of whether there was additional violative conduct which occurred before that time.

At oral argument, Birkelbach conceded that there was sufficient violative conduct during the five years immediately proceeding the DOE's filing of its complaint to support the SEC's findings that he violated his supervisory duties, and thus we have no trouble agreeing with the SEC's resolution of the timeliness challenge. Because we agree with the SEC that the disciplinary action was timely even if the five-year limit set out in § 2462 applies, we need not address § 2462's applicability. Accordingly, we reject Birkelbach's argument that the DOE's complaint was untimely.

## B. The Sanction

Birkelbach next argues that the SEC abused its discretion when it affirmed the sanction of a lifetime bar against him, as

it barred him in all capacities even though the disciplinary action was only against him in a supervisory capacity. Therefore, he first argues, the punishment was not tailored to the offense. Secondly, he argues that the SEC acted erroneously in affirming the NAC's decision to increase the sanction to a lifetime bar in all capacities.

"[T]he fashioning of an appropriate and reasonable remedy is for the [SEC], not this court, and the [SEC's] choice of a sanction may be overturned only if it is found unwarranted in law or without justification in fact." *Monetta*, 390 F.3d at 957 (alterations and quotation marks omitted). In other words, we will only disturb a sanction where we can find an abuse of the SEC's discretion. *Id.* In assessing the appropriateness of the sanction, the SEC often considers "the egregiousness of a respondent's actions, the isolated or recurrent nature of the violation, the degree of scienter, the sincerity of a respondent's assurances against future violations, the respondent's recognition that the conduct was wrongful, and the likelihood of recurring violations." *Id.* (quotation marks omitted).

Birkelbach's first contention is without merit. His argument that the SEC erred by failing to tailor his punishment to his conduct has two aspects, both a length and breadth challenge. Specifically, he argues that the SEC erred by imposing a lifetime bar, rather than a shorter suspension, and that it erred when it imposed sanctions against him related to capacities which were not relevant to his immediate conduct. This distinction is largely academic, though, as our analysis as to why the SEC did not err is the same for both aspects. While various SEC and FINRA opinions have suggested that typically the punishment should be tailored to the conduct in

question, the sanction guidelines for the rules in question contemplate that a lifetime bar "in any or all capacities" is an available sanction where the conduct is serious enough. FINRA, *Sanction Guidelines*, 11, 103 (2013); NASD, *Sanction Guidelines*, 11, 108 (2006) (retired). In its analysis, the SEC found that Birkelbach's conduct was sufficiently egregious to justify the lifetime bar in all capacities, noting Birkelbach's previous censure and suspension for very similar behavior to Murphy's; the long period of time that Birkelbach knowingly failed to address Murphy's many ethical violations; the fact that Birkelbach assigned Murphy to the Martinelli account despite knowing of FINRA's investigation into the Lowry account and permitted him to aggressively churn the account; his utter failure to take reasonable supervisory steps in light of the many red flags raised by Langlois, FINRA's investigation, and FINRA's request to place Murphy under close supervision; the significant harm caused to the customers on account of his inadequate supervision; and his habit of blaming others, including the clients from whom he and Murphy essentially stole, for his supervisory failures. We conclude that this was a meaningful review of Birkelbach's conduct, supported by the unrebutted facts of the case, and grounded in the law. In this light, we cannot say that the SEC abused its discretion in finding that this case was sufficiently egregious to impose a lifetime bar in all capacities. *See McCarthy v. S.E.C.*, 406 F.3d 179, 188 (2d Cir. 2005) ("Typically, such an abuse of discretion will involve either a sanction palpably disproportionate to the violation or a failure to support the sanction chosen with a meaningful statement of findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law,

or discretion presented on the record." (quotation marks omitted)).

Birkelbach does not directly address the SEC's reasoning, but rather he cites several cases in which FINRA imposed something less than a lifetime bar in all capacities for a failure to supervise. The SEC discussed those cases in its order, however, and found that they involved sufficiently different circumstances, such as a shorter period of inadequate supervision or other mitigating factors, to justify the difference in punishment. Birkelbach has not addressed the distinctions drawn by the SEC, and we agree with the SEC that those cases are sufficiently distinguishable. As such, the cited cases do not dictate a different result in this case. In any event, "[t]he employment of a sanction within the authority of an administrative agency is … not rendered invalid in a particular case because it is more severe than sanctions imposed in other cases." *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 187 (1973).

That leaves Birkelbach's second sanctions argument, namely that the SEC abused its discretion in affirming the NAC's decision to increase the sanction to a lifetime bar in all capacities. Basically, Birkelbach asserts that the NAC "punished [him] for exercising his right to … appeal a wrongful decision" from the hearing panel. (Appellee Reply Br. 14.) However, Birkelbach does not cite a rule, statute, constitutional provision, court case, or anything else which suggests that the SEC lacked the authority to affirm the increase of his sanction on appeal. As the SEC pointed out in its opinion, the NAC performs a *de novo* review of the entire record and may even take new evidence in certain

circumstances. *See* FINRA Rule 9346; *see also* NASD Rule 9346 (retired). The FINRA rules specifically put those considering an appeal on notice that the NAC "may affirm, dismiss, modify, or reverse with respect to each finding, or remand the disciplinary proceeding with instructions." FINRA Rule 9348; *see also* NASD Rule 9348 (retired). Indeed, the rule goes on to state that the NAC "may affirm, modify, reverse, *increase*, or reduce any sanction, or impose any other fitting sanction." FINRA Rule 9348 (emphasis added); *see also* NASD Rule 9348 (retired). Birkelbach was certainly on notice that he risked an increase of his sanction should he take an appeal to that body. Finally, the SEC noted in its opinion that Birkelbach acknowledged to the NAC that it could increase his sanction, and thus his argument that he was "somehow blindsided by the increase rings hollow," *William J. Murphy*, 2013 WL 3327752, at *28 n.164, which he does not deny or rebut in his petition to this Court. Accordingly, we conclude that the SEC did not abuse its discretion in affirming the NAC's decision to increase the sanction from a suspension to a lifetime bar in all capacities.

We note a lingering issue which we shall touch upon briefly. In dealing with the statute-of-limitations question discussed *supra*, the SEC held that sufficient violative conduct occurred within the five-year statute-of-limitations period to sustain Birkelbach's violations. However, it appears from some of the language in the SEC's opinion that when it was considering the sanction against Birkelbach, it may have considered violative conduct outside the five-year time frame. For example, in considering whether a lifetime bar was an appropriate sanction, the SEC noted that Birkelbach "had an economic

incentive to permit Murphy's churning" because the commissions on the Lowry account "represented 18% of BIS's total revenue from the *third quarter of 2002* through the end of 2005." *Id.* at *27 (emphasis added).

*Monetta* presumes that the SEC may consider pertinent conduct occurring both before and after the relevant violative period to craft its sanction. *See* 390 F.3d at 957 (considering both the isolated or recurrent nature of violations and the possibility of future violations). Accordingly, even assuming the five-year period applies, there was no error in the SEC considering events outside that period in crafting its sanction.

### III. CONCLUSION

For the foregoing reasons, Birkelbach's petition for review of the SEC's order imposing a lifetime bar in all capacities is DENIED.