FILED
United States Court of Appeals
Tenth Circuit

**March 5, 2018**

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————————

SECURITIES AND EXCHANGE
COMMISSION,

     Plaintiff - Appellee,

v.

CHARLES R. KOKESH,

     Defendant - Appellant.

No. 15-2087

———————————————————

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:09-CV-01021-SMV-LAM)**
———————————————————

Clinton W. Marrs, Marrs Griebel Law, Ltd., Albuquerque, New Mexico for Defendant-Appellant.

Robert B. Stebbins, General Counsel, Michael A. Conley, Solicitor, and Sarah R. Prins, Senior Counsel, Securities and Exchange Commission, Washington, D.C., for Plaintiff-Appellee.

———————————————————

Before **HARTZ**, **PHILLIPS**, and **McHUGH**, Circuit Judges.
———————————————————

**HARTZ**, Circuit Judge.
———————————————————

     This case returns to us after reversal and remand from the United States Supreme

Court. The Supreme Court held that the claims for disgorgement against Defendant

Charles Kokesh brought by the Securities and Exchange Commission (SEC) were subject

to the five-year limitations period in 28 U.S.C. § 2462. The SEC contends that $5,004,773 was converted within this period and must be disgorged. Mr. Kokesh contends that the SEC's causes of action first accrued more than five years before it filed its claim. We agree with the SEC because the SEC's claims accrued separately for each conversion of funds.

## I.    BACKGROUND

### A. Factual History

Defendant owned and controlled two SEC-registered investment-adviser firms, Technology Funding Ltd. (TFL) and Technology Funding, Inc. (TFI), which were the managing general partners of, and contracted to provide investment advice to, several SEC-registered business-development companies (the BDCs) formed by Defendant. The contracts that the BDCs had with TFL and TFI (the Advisers) prohibited payments to the Advisers not expressly delineated in the contracts. Nevertheless, Defendant directed the treasurer for the Advisers to take substantial sums from the BDCs to pay salaries and bonuses to Defendant and other officers and, although expressly prohibited in the contracts, to reimburse the Advisers' office rent. A 2000 amendment to the contracts between the BDCs and the Advisers authorized reimbursements to cover the salaries of the Advisers' "controlling persons," a term that included Defendant and other officers. But the amendment was obtained through misleading proxy statements signed by Defendant that falsely identified him as the only controlling person and grossly underreported his salary.

## B. Procedural History

The SEC filed its complaint against Defendant in New Mexico federal court on October 27, 2009. Among other things, it alleged that from 1995 through 2006 Defendant had misappropriated over $34.9 million from the BDCs to the Advisers. After a jury found that Defendant had committed the fraud, the district court ordered (1) that he pay a civil penalty of $2,354,593; (2) that he be enjoined from violating securities laws in the future; and (3) that he disgorge $34,927,329 (plus interest). He appealed and we affirmed. *See SEC v. Kokesh*, 834 F.3d 1158, 1168 (10th Cir. 2016).

Defendant sought Supreme Court review of our decision that the disgorgement claim was not subject to the five-year statute of limitations governing suits "for the enforcement of any civil fine, penalty, or forfeiture." 28 U.S.C. § 2462. The Supreme Court reversed, holding that "[d]isgorgement in the securities-enforcement context is a 'penalty' within the meaning of § 2462, and so disgorgement actions must be commenced within five years of the date the claim accrues." *Kokesh v. SEC*, 137 S. Ct. 1635, 1639 (2017).

On remand the SEC contends that Defendant must disgorge $5,004,773 converted within the limitations period—that is, after October 27, 2004. That sum comprises $279,295 for payment of office rent; $1,200,000 paid as a bonus to Defendant and another officer; and other payments to controlling persons totaling $3,525,478.

## II. DISCUSSION

The governing statute of limitations states:

3

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, *shall not be entertained unless commenced within five years from the date when the claim first accrued* if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462 (emphasis added). Focusing on the "first accrued" language, Defendant argues that the limitations period begins "when the claim first 'comes into existence'" and therefore the SEC's claims accrued when he began his fraudulent schemes. Aplt. Supp. Br. at 4. Stating that the first occasions on which he engaged in each type of misappropriation occurred as early as 1995 and no later than 2001, he concludes that the entire action is time-barred. The SEC responds that a new limitations period applied to each improper conversion of funds, so the limitations period had not expired for the conversion of $5,004,773 described above.

### A. The Meaning of § 2462

Although neither party directs our attention to the opinion, we recently interpreted § 2462 in *Sierra Club v. Oklahoma Gas & Electric Co.*, 816 F.3d 666 (10th Cir. 2016). Sierra Club filed suit seeking civil penalties against the owner-operator of a power plant for modifying a boiler without first obtaining a permit required by the Clean Air Act. *See id.* at 669. The suit was not filed, however, until more than five years after construction had commenced. *See id.* Sierra Club argued that the limitations period reset on each day that the construction continued without a permit, so civil penalties could be assessed for those days within the five-year limitations period. *See id.* at 671. We disagreed.

4

*Sierra Club* held that the conduct in that case constituted a continuing violation, rather than separately accruing violations, and then held that the limitations period commenced with the first day of unpermitted modification. *See id.* at 671–72 n.5. In determining that the modification of the boiler constituted a continuing violation, we explained that "[a] single violation continues over an extended period of time when the plaintiff's claim seeks redress for injuries resulting from a series of separate acts that collectively constitute one unlawful act, as opposed to conduct that is a discrete unlawful act." *Id.* at 672 (internal quotation marks omitted). That is, a violation is a continuing one "when the conduct as a whole can be considered as a single course of conduct." *Id.* (internal quotation marks omitted). The power-plant modification fit that description: "It is the act of constructing [without a permit] itself that is unlawful. 'Construct' is an active verb that has force after construction has begun. Thus, 'construct' should not be read to encompass a disjointed series of discrete acts of construction. 'To 'construct' is an ongoing project." *Id.* (alterations, citations, and internal quotation marks omitted).

Once we had so characterized the violation, we concluded that the limitations period had expired. We explained: "[A] claim accrues when the plaintiff has a complete and present cause of action. In other words, a claim accrues as soon as the plaintiff can file suit and obtain relief. And a continuing violation is actionable even before the last act of the violation where the conduct that has already occurred is sufficient to support a claim." *Id.* at 673 (citations and internal quotation marks omitted). Sierra Club argued that the opposite conclusion should follow if the challenged conduct constituted a continuing violation. It said that the fact that a violation is continuing should actually

5

delay the commencement of the limitations period until the last occurrence of the continuing violation. *See, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81 (1982). But we distinguished *Havens* on the ground that it concerned a statute of limitations with different language. In our view, the essential feature of § 2462 was that it speaks in terms of when a cause of action *first* accrues. *See Sierra Club*, 816 F.3d at 673–74 ("[T]he clock under § 2462 begins only once, when a claim *first* accrues. If the limitations period under § 2462 reset each day, the statutory term 'first' would have no operative force. In other words, the statute could just as easily state that the limitations period begins whenever 'the claim accrues.'").

The statute-of-limitations issue in this case therefore turns on whether Defendant's misappropriations of funds from the BDCs are properly viewed as a continuing violation or as a number of discrete wrongs. *Sierra Club* provides some guidance on that issue, but further exploration of the relevant law will be helpful.

### B. The Nature of Defendant's Violations

*Sierra Club* cited several federal appellate decisions to illustrate the difference between continuing violations and separately accruing ones. Two of those opinions held that the violation was a continuing one. The Supreme Court in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) addressed the limitations period for employee claims complaining of a hostile work environment. "Hostile environment claims," it said, "are different in kind from discrete acts. Their very nature involves repeated conduct." *Id.* at 115. This is due in part to the difficulty of establishing a hostile work environment based on a single act alone. The unlawful employment practice

6

"cannot be said to occur on any particular day." *Id.* "Such claims are based on the cumulative effect of individual acts." *Id.* The plaintiff was seeking redress for injuries resulting from "a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117. The Court held that a hostile-environment claim is timely as long as a plaintiff "file[s] a charge within 180 or 300 days [depending on which limitations period applies] of *any act that is part of the hostile work environment.*" *Id.* at 118 (emphasis added). (Thus, unlike the situation in *Sierra Club*, the fact that the misconduct constituted a *continuing* violation prolonged the limitations period rather than shortening it. *See id.*)

Also cited by *Sierra Club* was *Shomo v. City of New York*, 579 F.3d 176 (2d Cir. 2009), which considered a prisoner's Eighth Amendment claim of deliberate indifference to serious medical needs. The prisoner alleged that he had been diagnosed with right-arm paralysis and limited use of his left arm, but prison personnel had failed to follow orders by "several doctors . . . that he receive assistance with activities of daily living . . . , be transferred to specialized infirmary housing, and receive various treatments." *Id.* at 179–80. The court held that the prisoner could invoke "the continuing violation doctrine when challenging discrimination [by alleging] both the existence of an ongoing policy of deliberate indifference to his or her serious medical needs and some non-time-barred acts taken in the furtherance of that policy." *Id.* at 181 (internal alterations and quotation marks omitted).

On the other hand, other decisions cited with apparent approval by *Sierra Club* make clear that just because a person continued to engage in misconduct over an

7

extended period of time, it does not follow that the person had engaged in a singular continuing violation, as opposed to a series of separate violations, for limitations purposes.

*Figueroa v. District of Columbia Metropolitan Police Department*, 633 F.3d 1129, 1131 (D.C. Cir. 2011), involved a lawsuit under the Fair Labor Standards Act by police officers alleging that their overtime pay had been improperly calculated. For several years the officers had fulfilled the duties of detective sergeants but had not been paid the extra $595 per year that went with the position. The City eventually paid them that sum for each year they had served as detective sergeants, but rejected their claim that their overtime pay for those years should also be recalculated. The district court had held that the officers' overtime claims were time-barred, but the D.C. Circuit reversed. *See id.* at 1130–31. The court held that each element of the officers' overtime claims (performance and improper compensation) "recur[red] with each pay period" and that the limitations period therefore began anew from the time of each violation. *Id.* at 1135. It explained:

> [A]lthough the officers refer to their "each paycheck" theory as one involving "continuing claims," that term is something of a misnomer. In fact, the gravamen of this theory is not that there has been one continuing violation . . . , but rather that *there have been a series of repeated violations of an identical nature*.

*Id.* (citation and internal quotation marks omitted) (emphasis added).

In *Birkelbach v. SEC*, 751 F.3d 472, 479 (7th Cir. 2014), the defendant argued that his failure to supervise an underling who had engaged in trading misconduct "was a single indivisible act which accrued on the day of the first failure to supervise." The court held that acceptance of this argument would produce an "absurd" result. *Id.*

8

"Under his interpretation," the court reasoned, "if an unethical supervisor were to avoid detection for five years, he could continue his unethical behavior *forever* without [facing] discipline . . . ." *Id.* Rather, "[t]he rules contemplate a continuing duty to reasonably supervise, and any violative conduct that falls within the statute of limitations is independently sanctionable, regardless of whether there was additional violative conduct which occurred before that time." *Id.* The duty may have been a continuing one, but each act in violation of the duty created a separate claim.

And in *Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 117 (5th Cir. 1975), the court, following *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971), held that the conduct of persons who had allegedly conspired to violate the antitrust laws by engaging in a refusal to deal should be "viewed as a continuing series of acts upon which successive causes of action may accrue," rather than "as a single act and invasion of Poster's rights, occurring with the original refusal to deal . . . or with the earlier birth of the alleged conspiracy." 517 F.2d at 125; *see Zenith*, 401 U.S. at 338 ("In the context of a continuing conspiracy to violate the anti-trust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and . . . , as to those damages, the statute of limitations runs from the commission of the act."). The court concluded that "any other result here would, we think, improperly transform the limitations statute from one of repose to one of continued immunity." *Poster Exch.*, 517 F.2d at 127. The court remanded the case to determine whether there had been "some specific act or word" within the limitations

9

period that had prevented Poster from dealing with the defendants or whether there had been a "mere absence of dealing" during that period. *Id.* at 128.

Another opinion highly relevant to this case was not cited in *Sierra Club*. In *Rodrigue v. Olin Employees Credit Union*, 406 F.3d 434 (7th Cir. 2005), a doctor's assistant, Wiltshire, stole 269 insurance-reimbursement checks issued to her employer, Rodrigue, over seven years, fraudulently endorsing the checks to herself. *See id.* at 435. Applying Illinois law, the circuit court held that the negotiation of each separate check constituted a separate actionable conversion. *See id.* at 441–43. The court observed that "[u]nlike a cause of action for medical malpractice based on a course of negligent treatment with cumulative effects, or a cause of action for the intentional infliction of emotional distress arising from a course of tortious acts considered as a whole, *Rodrigue's claim for conversion does not depend on the cumulative nature of either Wiltshire's or [the bank's] acts*." *Id.* at 443 (emphasis added). "Rather, a cause of action for conversion arose each time Wiltshire cashed or deposited one of the checks she had embezzled. The fact that Wiltshire managed to negotiate hundreds of checks over an 85–month period is irrelevant insofar as Rodrigue's right or ability to sue for conversion." *Id.* As the court explained, "Whether Wiltshire had negotiated one check or 1000, Rodrigue had a valid cause of action for conversion; *nothing about the repeated or ongoing nature of Wiltshire's conduct affected the nature or validity of Rodrigue's suit, beyond increasing her damages.*" *Id.* (emphasis added). It concluded, "[I]n contrast to a claim that arises from a cumulation of wrongful acts, a claim for conversion does not pose undue difficulty for the victim in identifying the nature, origin, and extent of her injury."

10

*Id.* Thus, any claims concerning checks negotiated more than three years before the filing of plaintiff's suit were barred. *See id.* at 447.

In light of this authority, we readily conclude that Defendant's misappropriations of funds from the BDCs are properly viewed as discrete violations. Defendant's misconduct was not a continuing omission to act in compliance with a duty, as in *Sierra Club* (failure to obtain a permit) or *Shomo* (failure to provide medical care). Nor did the "very nature" of the misconduct "involve[] repeated conduct." *Morgan*, 536 U.S. at 115. And the SEC's claim did "not depend on the cumulative nature of [Defendant's] acts." *Rodrigue*, 406 F.3d at 443. Rather, the gist of Defendant's misconduct was taking funds without proper authority, without consent. Some misappropriations were contrary to the terms of the contracts between the BDCs and the Advisers. Some were authorized by the 2000 amendment to the contracts, but the amendment was approved by the investors only because they were defrauded by the proxy statements, so there was no valid consent. As in *Figueroa*, the misappropriations constituted "a series of repeated violations of an identical nature," 633 F.3d at 1135 (internal quotation marks omitted), with each unlawful taking being actionable for five years after its occurrence.

To hold that Defendant's misappropriations constituted only one continuing violation would do much more than provide repose for ancient misdeeds; it would confer immunity for ongoing repeated misconduct. *See Poster Exch.*, 517 F.2d at 127. Defendant could take $100 a year for five years and then misappropriate tens of thousands without fear of liability. We cannot countenance such a result, nor do we think that a proper interpretation of § 2462 requires us to.

11

We **REVERSE** the judgment of the district court and **REMAND** with instructions to enter an order requiring Defendant to disgorge $5,004,773.